[No. 17367-1-II. Division Two. October 10, 1995.]

HARLAND MALYON, *Appellant*, v. PIERCE COUNTY, *Respondent.*

454

*Dan M. Albertson,* and *Albertson Law Offices,* for appellant on behalf of American Civil Liberties Union of Washington Foundation.

*John W. Ladenburg, Prosecuting Attorney,* and *Daniel R. Hamilton, Deputy,* for respondent.

*Steven T. McFarland* on behalf of Christian Legal Society, amicus curiae.

WIGGINS, J. — Plaintiff Harland Malyon asked the superior court to declare that the Pierce County Sheriff's Department chaplaincy program violates the establishment of religion clauses of the Washington State Constitution, article I, section 11 (section 11), and the First Amendment to the United States Constitution. Malyon also sought an injunction prohibiting the application of public funds or property to the chaplaincy program. The superior court granted Pierce County's motion for summary judgment of dismissal. Under the Washington State Constitution, we hold that the six neutral, nonexclusive factors identified in *State v. Gunwall*[1] require interpretation of section 11 independent of the First Amendment. We hold that the Sheriff's Department chaplaincy program may be constitutional under section 11 because religious activities are conducted by unpaid volunteer chaplains. But we cannot determine from this record whether the program is religiously neutral, or whether it might support a religious

---

[1]106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

establishment, and so reverse and remand for further proceedings. Under the First Amendment, we hold that the United States Supreme Court would not apply to this program the three-part test of *Lemon v. Kurtzman*.[2] Instead of *Lemon*, we believe the Court would follow its more recent decisions, asking whether the program: has a secular purpose; is neutral to religious belief or unbelief; or, creates any real likelihood that the state endorses or coerces religious practices. We cannot determine from this record whether the program meets these three conditions, and reverse and remand to the trial court to make this determination.

## FACTS

Prior to 1984, county deputy coroners and deputy sheriffs gave death notifications to the next of kin of deceased persons. Deputy sheriffs also provided crisis intervention to victims of violent crimes and to their families. Neither the coroners nor the sheriffs were trained to handle these responsibilities or to cope with the stresses of these tasks. Uniformed sheriff's deputies also suffered emotional and psychological problems caused by their daily exposure to violence and tragedy in performing their duties.

In 1984, the Pierce County Sheriff's Department (Sheriff's Department) contracted with an organization called the Tacoma Pierce County Chaplaincy (TPCC) to provide the following services to Sheriff's Department employees and to crime victims and their families:

a. 24 hour crisis intervention for PCSD deputies, corrections officers, and non-commissioned employees and their families as well as critical incident stress debriefing.

b. 24 hour crisis intervention and victim counseling for victims of violent crime and their families, as well as liaison duties between them and PCSD.

c. Death notifications, counseling and attendant procedures for PCSD employees and citizens.

---

[2] 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).

The contracting organization, TPCC, is described as "a private non-profit and non-sectarian Christian Ministry made up of ministers or lay-ministers qualified in crisis intervention and holding beliefs as divergent as Catholics and Quakers, Lutherans and Assemblies of God." TPCC provides crisis intervention services for ten other public agencies in addition to the Sheriff's Department, including the Tacoma Fire and Police Departments, and the Washington State Patrol.

One full-time paid employee of TPCC, Dan Nolta, is designated as the Pierce County Sheriff's Chaplain, answerable to the sheriff. Nolta trains, coordinates and supervises volunteer chaplains who provide crisis intervention services on a twenty-four hour basis to the Sheriff's Department and to the Office of the Medical Examiner. Seventeen volunteer chaplains in addition to Nolta served in the chaplaincy program from 1984 through 1990. Sixteen of the seventeen were affiliated with Christian denominations. Nolta requires that a volunteer chaplain be a pastor of a local congregation, "credentialed," willing to receive training, and able to relate to people in law enforcement and in crisis. Currently, all volunteer chaplains are from Christian churches because, according to Nolta's deposition, only a small minority would want a non-Christian chaplain, the current chaplains are a compatible group, and he views the chaplaincy as a "Christian ministry." Nolta stated in a later affidavit that he would accept any religious or secular counseling organization which was accepted by the Sheriff's Department, and "would expect them to work with the current chaplains on an equal footing."

Law enforcement chaplaincy programs are authorized by Washington statute.[3] Sheriff's Department chaplains serve under the terms of a broadly worded, annual, renewable contract, which recites that it is made pursuant to the statute. The chaplains agree to work under the direction of the sheriff at the request of Sheriff's Depart-

---

[3]RCW 41.22.010-.900 (1994).

ment personnel, and that they "shall use appropriate crisis intervention skills to meet the emotional, physical, and spiritual needs of those individuals involved, referring them to appropriate community resources." The chaplains agree to provide a volunteer service, and the agreement disclaims any employer/employee or master/servant relationship. Pierce County agrees to provide the equipment and supplies necessary to perform chaplain duties, a mileage allowance, accidental medical coverage, liability insurance coverage, and training and supervision. Nothing in the agreement refers to religion with the possible exception of the undertaking to meet the "spiritual needs" of the individuals counseled and each chaplain's agreement to operate under the policies and guidelines of the TPCC. Apparently each volunteer chaplain signs an agreement annually.

While this action was pending in the trial court, Pierce County issued a public request for proposal (RFP) for an organization to provide volunteer chaplaincy services, following the procedures established by Pierce County Code section 2.106.050 for solicitation of professional consultant contracts. The RFP seeks bids for "the services of a volunteer organization with at least ten members qualified and available to serve the crisis intervention needs of the law enforcement personnel of Pierce County, their families, and the citizens of this county who are the victims of crime." The RFP recited, "This organization must be willing to work with no compensation, on a volunteer basis, the only exception being reimbursement for mileage, insurance coverage, loaned radios and office space for an appointed director to coordinate responses and programs." Nothing in the RFP refers to religion or religious services.

TPCC submitted the only proposal, and Pierce County entered into a personal services contract with TPCC in October 1991. The contract describes the scope of work as crisis intervention for law enforcement personnel and their families, crime victim counseling, death notification with attendant counseling, and critical incident stress

debriefing. The contract makes clear that the services are provided by contractors, not employees, and that all work is without compensation. The contract incorporates Pierce County's affirmative action plan, and prohibits the contractor from discriminating against any employee or applicant for employment on the basis of race, sex, color, creed, age, national origin, or handicap. Other than the term "chaplaincy" and the prohibition against discrimination on the basis of creed, the contract says nothing about religion.

The volunteer chaplains complete reports on each counseling encounter. Some reports were included in this record, and demonstrate that the chaplains counsel a variety of people. Reports include counseling for: a rape victim; a married couple after the husband unsuccessfully attempted to commit suicide; the family of a suicide victim; police officers; the girlfriend of a man killed in a motorcycle accident; the parents of children drowned in a boating accident; the parents of a boy killed while driving to school; a widow who recently lost her husband; and a person who had recently attempted to commit suicide.

The record also includes the transcription of a promotional videotape which describes TPCC and includes the following testimonial examples of the chaplains' work:

> Woman: My husband was a police officer and about a year ago he was killed in the line of duty. When they came to tell me that he had just died, I didn't know what to do or where to turn. I was so thankful that a police chaplain was there to help me . . . . They helped me deal with the news media and they helped me with all the funeral arrangements . . . .
>
> . . . .
>
> Principal: As principal of Spanaway Junior High School I wasn't at all prepared for what I discovered when I arrived at the school following the shooting. [A student had shot and killed two other students then committed suicide.] Kids and teachers were everywhere, crying and disoriented. Both the fire and police units were on the scene and media was there wanting more information. But fortunately, the chaplains of

the Pierce County Chaplaincy were there ready to help in any way they could. They seemed to know just what to say to my students and staff and they helped me deal with the media and the emergency crews that were on the scene. In the days and weeks to follow, they continued to stand by everyone at Spanaway Junior High. They even organized a memorial service allowing the kids to come together to remember their friends . . . .

. . . .

Man: One day my partner and I responded to a domestic call out in the South end of Tacoma. Soon after we arrived on the scene I was attacked by a crazed, knife wielding man and in the struggle that followed, my partner was fatally shot to death by a bullet from my own revolver. To say the least, I came unglued. The week that followed seems like a blur now, but I do remember from the very beginning one of our police chaplains was there. Standing beside me, ready to help any way he could. In the weeks that, actually, from the time it started, they called or stopped by daily just to see how I was doing and to make sure everything was going smooth for me. And they even made arrangements for my partner's widow and I to meet and talk things over. I know now that without the chaplain's help, I couldn't have made it through this time of crisis in my personal life and in my career.

### CHALLENGED PRACTICES

The Amended Complaint in this case seeks a declaratory judgment that three practices are unconstitutional and asks for an injunction against those practices. The most significant complaint is "the expenditure of public monies or property for chaplains who engage in religious worship and exercise . . . ."

Pierce County does not pay any of the chaplains for their services. TPCC, the nonprofit organization, pays Nolta's salary. The volunteer chaplains work for free and are not paid by Pierce County or by TPCC. But the Sheriff's Department does provide the chaplaincy program with the following property, reimbursements, and services:

1. An office in the West Precinct;

2. A car for Dan Nolta's use in responding to crisis calls;

3. A uniform/bullet proof vest for Dan Nolta, a dress uniform for department functions, and a few Sheriff's Department's jackets for other chaplains;

4. Police radios to volunteer chaplains so they can respond to requests for emergency services;

5. A computer loaned to the TPCC for purposes of data storage;

6. Training seminar reimbursement for Dan Nolta's expenses;

7. Mileage reimbursement for chaplains (now apparently discontinued);

8. Office supplies and equipment;

9. Accidental medical coverage;

10. Liability insurance coverage.

The annual cost to Pierce County of providing these benefits has fluctuated between $1000 and $5000 from 1984 through 1991. The County asserts that it could not make use of the services of the chaplains without these expenditures. Pierce County asserts that it could not afford to purchase the services now provided free of charge by the volunteer chaplains.

TPCC is also provided an office in the Pierce County and City of Tacoma building (County-City Building). Pierce County presented evidence that the office is provided by the City of Tacoma, not by Pierce County. No evidence has been provided to us regarding any contractual relationship under which the office is provided, and neither TPCC nor the City of Tacoma is a party to this litigation. It is unclear the extent to which the Sheriff's Department chaplaincy program benefits from the TPCC's use of the office in the County-City Building, but there is no evidence that the TPCC office is part of the chaplaincy program, and we will not consider it further.

The chaplains discuss "spiritual" needs with the persons

with whom they counsel. Nolta distinguishes between the words "spiritual" and "religion." "Spiritual" refers to "moral values and the inplacement of those moral values and man's desire to have knowledge outside himself," which includes recognition of a "higher being." "Religion" refers to "organized formal religion, denominationalism, sectarianism, promoting one denomination over another." Nolta stated that the chaplains provide spiritual counsel when the person indicates that they have a spiritual need, and that this occurs in perhaps fifteen percent of all counseling. For example, a person notified of the death of a family member might ask, "Why would God allow this?"

Nolta stated in his affidavit that the volunteer chaplains are trained to respect the religious traditions of all, and not to promote the doctrines of their own churches:

> Sheriff's [c]haplains are trained and instructed not to force a specific religious or ideologic agenda on person[s] in crisis but to have empathy for their sensibilities and particular beliefs. Chaplains before assuming their duties agree that in performing their duties they are not representatives of their respective denominations but Pierce County Sheriff's chaplains — answerable concerning their duties to the Sheriff and Sheriff's chaplain and no other — and instructed not to disseminate church literature, talk about their church or even use church business cards. Indeed, one of the first questions chaplains are trained to ask in a situation of spiritual crisis is whether the person in crisis has a spiritual counselor that he or she could be put in contact with by the chaplain. This is done regardless of the chaplain's personal religious affiliation, and in the rare situations where one in spiritual crisis indicates a non-Christian or anti-religious tradition or belief, the desired non-Christian spiritual or sectarian counselors are contacted. If in attending to an indicated spiritual component to a particular crisis it is determined that prayer or scripture reference is appropriate, chaplains will participate if qualified and appropriate or seek another counselor — whether Christian or non-Christian — who is. Where helpful and consistent with the tradition or belief of persons in crisis, their indication of a desire to attend a Christian or non-Christian church or other religious organization will be supported by Sheriff's

chaplains, and if in so doing they have no church and state a desire to attend that of the chaplain, they are not turned away. The services of Sheriff's [c]haplains are provided freely to those of all beliefs; they have counseled atheists as well as theists of Christian and non-Christian belief — counseling them in the context of whatever their belief system may be.

Neither Chief French of the Sheriff's Operations Department nor Dr. Lacsina, the County Medical Examiner, had ever heard any complaint about religious conduct by a chaplain.

The record includes a number of chaplains' reports that refer to spiritual or religious discussions. Chaplains reported that they prayed, read scripture, discussed church backgrounds of counseling subjects, discussed spiritual/religious issues, referred subjects to military chaplains or to pastors of local churches, invited subjects to their own churches, and in a few cases "shared" about Jesus Christ or "share[d] Gospel." It is not possible to determine from the chaplains' reports how often chaplains discussed spiritual/religious matters. Pierce County contends that plaintiff was able to find references to "shar[ing] the Gospel" or the chaplain's faith in less than one percent of the reports. Plaintiff responds that the great majority of the chaplain's reports produced by the County are unreadable, and that the identifiable references in the legible reports "more probably than not, significantly understate[ ] the amount of references to religious activity on the part of [the] chaplains contained within the reports." Nolta estimated that no more than fifteen percent of the contacts include discussion of spiritual/religious subjects. We hold it unnecessary to decide exactly how much of the chaplain's counseling refers to religious or spiritual subjects in order to resolve plaintiff's challenge to the chaplaincy program.

Plaintiff also contests the expenditure of public moneys or property for the solicitation of financial support for the TPCC. The record reflects that letters were sent to Sheriff's Department employees: a January 9, 1985 letter

signed by two officers, apparently not on department letterhead; a January 15, 1989 letter on department letterhead signed by four officers and by the sheriff himself. Pierce County admitted that public funds or resources were used for these letters. On one occasion a TPCC promotional videotape was shown to law enforcement personnel during working hours.

ANALYSIS

Washington State Constitution

We analyze the constitutionality of the Sheriff's Department chaplaincy program under both the Washington State Constitution and the First Amendment of the United States Constitution. We first analyze our state constitution.

██ In *State v. Gunwall*,[4] our supreme court set forth a framework within which to analyze the Washington State Constitution. The Washington courts look to the interpretation of corresponding provisions of the United States Constitution as "important guides" in interpreting our own state constitution.[5] If we decide that the state constitution is coextensive with the federal constitution, then we need only use the federal constitutional analysis. But if we decide that our state constitution provides greater protection than the federal constitution, then we analyze our state constitution separately.

Six neutral, nonexclusive criteria govern our decision whether the state constitution provides more extensive protection than the federal constitution: the textual language of the state constitution; significant differences in the texts of parallel provisions of the federal and state constitutions; state constitutional and common law history; preexisting state law; differences in structure be-

---

[4]106 Wn.2d at 61-63.

[5]106 Wn.2d at 60-61 (quotation omitted).

tween the federal and state constitutions; matters of particular state interest or local concern.[6]

The Washington State Constitution includes two religious establishment clauses: article I, section 11 prohibits the application of public money or property to religious worship, exercise, and instruction; article IX, section 4 prohibits "sectarian control or influence" over public schools. The Washington State Supreme Court has interpreted the freedom of religion clause of article I, section 11 independently of the First Amendment,[7] but has never analyzed the six *Gunwall* factors with respect to the establishment clause of section 11. In its 1973 decision in *Weiss v. Bruno*,[8] the Supreme Court stated, "we recognize that the proscription of article IX, section 4 is far stricter than the more generalized prohibition of the first amendment to the United States Constitution." In 1989, in *Witters v. Commission for the Blind*,[9] (*Witters* II) the court apparently extended the Weiss statement to section 11, indirectly stating that it was "far stricter" than the First Amendment. But *Witters* II does not determine whether section 11 should be applied more strictly with respect to the chaplaincy program for at least two reasons. First, *Witters* II did not analyze the *Gunwall* factors, providing us with no guidance for this case.[10] Second, even though a particular state constitutional provision might afford broader protection than federal law in some applications, it may not in others.[11] Thus even when the court has used the *Gunwall* factors to analyze a provision of the state

---

[6]*Gunwall*, 106 Wn.2d at 61-62.

[7]*First Covenant Church v. City of Seattle*, 120 Wn.2d 203, 226, 840 P.2d 174 (1992).

[8]82 Wn.2d 199, 206, 509 P.2d 973 (1973).

[9]112 Wn.2d 363, 368, 771 P.2d 1119, *cert. denied*, 493 U.S. 850 (1989). *See also Witters v. Commission for the Blind*, 102 Wn.2d 624, 626, 689 P.2d 53 (1984) (*Witters* I), *rev'd*, *Witters v. Washington Dep't of Serv. for the Blind*, 474 U.S. 481, 489 (1986).

[10]112 Wn.2d at 374 (Utter, J., dissenting).

[11]*See, e.g., Bedford v. Sugarman*, 112 Wn.2d 500, 507, 772 P.2d 486 (1989).

constitution and has determined that an independent state action is present, under a different context a new *Gunwall* analysis is required.[12] Accordingly, we turn to an analysis of the *Gunwall* factors.

1. The Textual Language of the State Constitution;

2. Significant Differences in the Texts of Parallel Provisions of the Federal and State Constitutions

The establishment clause of article I, section 11 (section 11) reads:

> No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment: PROVIDED, HOWEVER, That this article shall not be so construed as to forbid the employment by the state of a chaplain for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice as in the discretion of the legislature may seem justified.[13]

Article IX, section 4 also prohibits sectarian control over education:

> All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

---

[12]*See State v. Russell*, 125 Wn.2d 24, 58-59, 882 P.2d 747 (1994), *cert. denied,* 115 S. Ct. 2004 (1995).

[13]The full text of the religious freedom article is:

"Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment: PROVIDED, HOWEVER, That this article shall not be so construed as to forbid the employment by the state of a chaplain for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice as in the discretion of the legislature may seem justified. No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror, in consequence of his opinion on matters of religion, nor be questioned in any court of justice touching his religious belief to affect the weight of his testimony." Wash. Const. art. I, § 11 (amended 1904, 1957, 1993).

The sectarian control clause is repeated in article XXIV, section 4, which was required by Congress as a condition of admission to statehood:

> Provision shall be made for the establishment and maintenance of systems of public schools free from sectarian control which shall be open to all the children of said state.

By contrast, the First Amendment of the United States Constitution is so brief that it is cryptic: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."

The language of section 11 alone virtually demands an interpretation different from the First Amendment. Contrasted with the generality of the First Amendment, section 11 is more specific in several ways. First, section 11 concerns itself expressly with both appropriation and application, while the First Amendment more broadly prohibits "any" law "respecting" an establishment of religion. Second, section 11 refers both to public money and to public property. Third, section 11 lists four uses for which public money and property must not be appropriated or applied: religious worship, exercise or instruction, or the support of any religious establishment, while the First Amendment more narrowly limits itself to an establishment of religion. In *Witters* II, the Supreme Court noted that section 11 is both " 'sweeping and comprehensive,' " making it inappropriate to apply federal Establishment Clause analysis to section 11.[14]

In short, the language of section 11 provides the court with considerably more specific guidance than does the First Amendment. Whether section 11 is "broader" or "narrower" in scope, it is certainly differently and more specifically worded.

### 3. State Constitutional and Common Law History

The prestatehood history of Washington Territory sheds

---

[14]*Witters* II, 112 Wn.2d at 370 (citing *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 375, 173 P. 35 (1918)).

only a glimmer of light upon the application of section 11 to the Sheriff's Department chaplaincy program. As with most states, social services in territorial Washington were pioneered by the churches. The Sisters of Providence established the first hospital in Seattle in 1877 in response to a published request by King County for proposals to care for the indigent sick of King County.[15] The delegates to the constitutional convention were aware of the efforts of the Sisters of Providence, as is made clear by the remarks of Delegate Cosgrove upon the proposal to exempt church property from taxation: "Ever since he had seen sisters of charity succoring the wounded on the battlefield all prejudice had passed away. The said sisters in the hospital here had been six years in paying $1000 of debt."[16] Thus, the delegates were aware of at least one case of a religious society rendering public health care under public contract, and it is unlikely that they intended section 11 to limit the ability of religious societies to contract with public agencies.

█ The events of the constitutional convention of 1889 tend to support the independent interpretation of section 11. First, unlike the United States constitutional convention, which never opened its sessions with prayer, the Washington convention appointed and paid a chaplain who opened each session with prayer. After the federal convention had already deliberated for a month, Benjamin Franklin unsuccessfully suggested that a member of the clergy be asked to offer prayer at the commencement of each day's deliberations, but the convention adjourned without voting on the matter.[17] The omission of prayers contrasted with the actions of the earlier Continental

---

[15]Ellis Lucia, *Seattle's Sisters of Providence: The Story of Providence Medical Center—Seattle's First Hospital* 21-22 (1978). *See generally* David M. Buerge & Junius Rochester, *Roots and Branches: The Religious Heritage of Washington State* 140-41 (1988).

[16]*Discussing Taxation: Considering an Important Article*, TACOMA DAILY NEWS, Aug. 7, 1889, at 1.

[17]Leo Pfeffer, *Church, State and Freedom* 122 (1967 rev. ed.).

Congress, which had immediately designated an Anglican clergyman to open each day's deliberations with prayer (who unfortunately, after serving two years, defected to the British side and returned to England).[18] But in 1889 Congress appropriated funds for the Washington convention delegates to employ and pay a chaplain, and the delegates selected a chaplain on the second day of their proceedings.[19] This fact alone suggests that the framers felt that the federal government was to have no role with respect to religion while the state governments were freer to adopt some nonsectarian religious practices, such as authorizing chaplains.

Second, in deliberate contrast to the United States Constitution, the delegates decided to include in the Preamble a reference to "the Supreme Ruler of the Universe," a reference both religious and nonsectarian. As initially proposed by the Committee for the Preamble and Declaration of Rights, the Preamble simply recited, "We, the people of the State of Washington, to preserve our rights, do ordain this Constitution."[20] When the Preamble was considered before the entire convention, several members moved to insert a statement of thanks to God or to "the Supreme Ruler of the Universe."[21] When Delegate Comegys argued that the United States Constitution did not mention God, Delegate Buchanan responded that, "No matter what Congress did, the colonies set the example. They recognized the Creator by frequently devoting days to thanksgiving and humiliation for the blessings bestowed upon them."[22] After heated debate, the issue was referred back to the Committee, which adhered to its original decision, with a minority report favoring the language, "We

---

[18]Pfeffer, *supra,* at 120.

[19]*Journal of the Washington State Constitutional Convention, 1889* 7-9 (Beverly P. Rosenow ed. 1962) (hereinafter *Journal*).

[20]*Journal, supra,* at 153.

[21]*The Constitution: Shall the Constitution Recognize the Deity,* SEATTLE POST-INTELLIGENCER, July 30, 1889, at 1.

[22]*Id.* at 1.

the people of Washington, grateful to the Supreme Ruler of the universe for our liberties, do ordain this constitution."[23] The minority prevailed, prompting one newspaper to comment that God had gotten into the Constitution "under an alias."[24] As one law review article suggests, this rather diffuse reference to God suggests the convention delegates' view of religion as an important component of a stable society, tempered by their caution "to purify this state-sanctioned religion from any taint of sectarianism."[25]

Third, the primary concern about religious establishment at the time of the Washington convention was the issue of "sectarian" control over the schools, a quite different issue than the concerns that motivated the Establishment Clause of the First Amendment. Concern over the growth of parochial schools and a desire to prevent the use of public funds to support parochial schools almost led to an amendment to the federal constitution in 1876 and later years.[26] Congress included in the Washington's Statehood Enabling Act a requirement that the delegates adopt a provision ensuring that the public schools shall be "free from sectarian control."[27] The delegates responded by enacting article IX, section 4, which prohibited sectarian control in the exact words required by Congress. This overriding concern provides a background against which section 11 should be interpreted, which differs from the issues prevailing at the time of the First Amendment.

Fourth, section 11 was amended in 1904 to authorize

---

[23]*Journal, supra,* at 198.

[24]Betty Parkany, *"Religious Instruction" in the Washington Constitution* 17 (1965) (unpublished paper, University of Washington).

[25]Robert F. Utter & Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution,* 15 HASTINGS CONST. L.Q. 451, 477, 478 (1988).

[26]*See* Utter & Larson, *supra,* at 458-67; *see also* Frank J. Conklin & James M. Vache, *The Establishment Clause and the Free Exercise Clause of the Washington Constitution—A Proposal to the Supreme Court,* 8 U. PUGET SOUND L. REV. 411, 436-41 (1985).

[27]Enabling Act of Feb. 22, 1889, ch. 180, 25 Stat. 676 (1889), *quoted in* Conklin & Vache, *supra,* at 436.

the State to hire chaplains for state penitentiaries and reformatories, in 1958 to allow chaplains for all custodial, correctional and mental institutions, and again in 1993 to authorize county and public health districts to hire chaplains for hospitals, health care facilities, and hospices.[28] These express but limited authorizations of chaplains bear on the meaning of section 11 and favor an independent interpretation.

### 4. Preexisting State Law

■ Plaintiff observes that our supreme court has consistently interpreted the establishment clause of section 11 strictly and independently of the First Amendment.[29] Pierce County argues that this fourth *Gunwall* factor refers only to law that predates the constitution and cannot include law decided after 1889. Contrary to Pierce County's argument, our courts have frequently resorted to post-1889 laws in analyzing the fourth *Gunwall* factor.[30]

We agree with plaintiff that our supreme court has independently interpreted section 11, and that this history of interpretation favors an independent interpretation in this case. In the 1918 decision in *State ex rel. Dearle v. Frazier*, the court declined to follow the decisions of other state courts, pointing to the "sweeping and comprehensive" words of section 11.[31] In the 1989 decision of *Witters* II, the court quoted *Frazier*'s characterization of this "sweep-

---

[28]Wash. Const. amend. IV (1904); Wash. const. amend. XXXIV (1958); Wash. Const. amend. LXXXVIII (1993).

[29]*E.g.*, *Witters* II, 112 Wn.2d at 368-69; *State ex rel. Dearle v. Frazier*, 102 Wash. at 381 (striking Bible instruction in schools) ("[P]urpose of men of that time to avoid all of the evils of religious controversies, the diversion of school funds to denominational schools . . . and the litigation that had occurred in other states . . . .); *State ex rel. Clithero v. Showalter*, 159 Wash. 519, 522, 293 P. 1000 (1930) (deferring to the *Frazier* interpretation of article I, section 11), *appeal dismissed*, 284 U.S. 573 (1931).

[30]*E.g.*, *Russell*, 125 Wn.2d at 60-61; *First Covenant Church*, 120 Wn.2d at 224-25.

[31]102 Wash. at 374-75.

ing and comprehensive" language, again independently interpreting section 11.[32]

Plaintiff points to the legislative history of RCW 41.22.030, which authorizes volunteer chaplains for law enforcement agencies, arguing that this supports the interpretation that the constitution prohibits the expenditure of public moneys for law enforcement chaplains. We agree with plaintiff that the enactment of RCW 41.22.030 supports the independent interpretation of section 11 with respect to law enforcement chaplains, because it reflects a legislative purpose to accommodate the needs of law enforcement personnel within constitutional limitations through the use of volunteer chaplains.

5. Differences in Structure Between the Federal and State Constitutions

The supreme court has pointed out that this factor always favors an independent state interpretation.[33] We add that this factor takes on added significance with respect to the establishment clause. When the First Amendment was drafted, some of the states still maintained religious establishments[34] and it was clear that the Establishment Clause applied to the federal government in a way in which it could not have applied to the states. Indeed, early versions of the First Amendment would have applied to the states as well, and Madison argued strenuously for these versions, but the final version restrained only Congress, not the states.[35]

The United States Supreme Court held in *Everson v. Board of Educ.*[36] that the Establishment Clause of the First Amendment was made applicable to the states through the Fourteenth Amendment. But section 5 of the Four-

---

[32]112 Wn.2d at 370.

[33]*Russell,* 125 Wn.2d at 61.

[34]Pfeffer, *supra,* at 141; *see also Everson v. Board of Educ.,* 330 U.S. 1, 13-14, 67 S. Ct. 504, 91 L. Ed. 711, 168 A.L.R. 1392 (1947).

[35]Pfeffer, *supra,* at 139-40.

[36]330 U.S. at 14-15.

teenth Amendment gives the Congress the power to enforce the provisions of the amendment. Congress arguably did so in 1889 in the Enabling Act when it required Washington and the other newly admitted states to include in their constitutions a prohibition against sectarian control of the public schools and a clause guaranteeing the free exercise of religion. Independent interpretation of section 11 supports Congress's actions to implement section 5 of the Fourteenth Amendment and to the congressional intent reflected in the Enabling Act.

## 6. Matters of Particular State Interest or Local Concern

■ Law enforcement traditionally has been a matter of particular state interest and local concern.[37] Law enforcement chaplaincies are intertwined with this local concern. Law enforcement chaplaincies are also a matter of local concern insofar as there is no apparent need for a consistent national policy or constitutional doctrine regarding them. The constitutional amendments authorizing chaplains in custodial and medical institutions and the legislative authorization of chaplaincies in chapter RCW 41.22 reflects that the people of Washington have a particular interest in chaplaincies.

## 7. Uncertainty of Federal Constitutional Doctrine

■ The six *Gunwall* factors are not exclusive.[38] In adopting an independent interpretation of the free exercise clause of article I, section 11 in *First Covenant Church v. City of Seattle*,[39] the court considered that recent interpretations of the Free Exercise Clause of the First Amendment by the United States Supreme Court were "uncertain." We similarly find recent United States Supreme Court cases under the Establishment Clause of the First Amendment to be uncertain, as discussed later in this

---

[37]*Cf. United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 1631 n.3, 131 L. Ed. 2d 626 (1995) ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law.") (quotations omitted).

[38]*Gunwall*, 106 Wn.2d at 61.

[39]120 Wn.2d at 225-26.

opinion. We find in this uncertainty an additional reason to interpret section 11 independently.

■ All of the *Gunwall* factors favor an independent interpretation of section 11. The First Amendment and section 11 express two contrasting philosophies regarding the role of church and state. The First Amendment has been interpreted since *Everson v. Board of Educ.* in light of Thomas Jefferson's metaphor of building " 'a wall of separation between Church and State,' "[40] disabling the state from virtually any relationship with religion. By contrast, the Washington State Constitution implicitly recognizes a diffuse divine or moral presence in the universe, but specifically prohibits the application or appropriation of public funds and property to specific religious acts. We hold that our own constitution differs sufficiently from the First Amendment that we must interpret section 11 independently.

## Analysis Under Section 11

■ Our independent analysis turns on the language of section 11: "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . . ." We hold that this program is constitutional under section 11 if it serves a secular purpose and is religiously neutral. Volunteers participating in the program may engage in religious worship, exercise or instruction so long as those activities are initiated by the beneficiary of the program, not by the volunteer participants, and so long as the volunteers are not compensated for any time they devote to such activities. The Sheriff's Department chaplaincy program may be constitutional, but disputed factual issues preclude summary judgment, and we reverse and remand for trial to determine the facts.

---

[40]*Everson*, 330 U.S. at 16 (quoting *Reynolds v. United States*, 98 U.S. 145, 164, 25 L. Ed. 244 (1878)).

We consider separately each element of section 11:

1. No public money or property

2. shall be appropriated for or applied to

3. any religious worship, exercise or instruction, or the support of any religious establishment.

Pierce County admits the first element of section 11 is satisfied here—public money and property has been used for the chaplaincy program.

## No Appropriation of Funds

■ We hold that Pierce County has not "appropriated" funds or property for religious worship, exercise or instruction, or the support of any religious establishment. The funds and property are appropriated for a facially secular chaplaincy program that provides crisis intervention and counseling. Nothing in the RFP or in the personal services contract refers to religious worship, exercise or instruction, or to the support of any religious establishment, and the services of a chaplain do not necessarily implicate religious worship, exercise or instruction.

## Application of Funds to Religious Worship, Exercise or Instruction

■ It is a closer question whether Pierce County has "applied" funds or property to religious worship, exercise or instruction, or to the support of any religious establishment. The word "apply" has several meanings, but the relevant definition for our analysis is "[t]o use or employ for a particular purpose; to appropriate and devote to a particular use, object, demand, or subject-matter."[41] For clarity, we first analyze worship, exercise and instruction, and then separately analyze the support of a religious establishment.

■ The volunteer chaplains engage in religious wor-

---

[41]BLACK'S LAW DICTIONARY 65 (6th ed. 1991).

ship, exercise or instruction. The record discloses that they pray, read scripture, and occasionally "share" about Jesus or "share" the Gospel. But the uncompensated volunteer status of the chaplains is crucial in resolving the application of section 11 to this program. Public funds are used, employed or devoted to a constitutionally permissible crisis intervention and counseling program. Pierce County does not require the chaplains to offer religious worship, exercise or instruction, and does not compensate the chaplains any differently whether or not religious services are offered. The chaplains volunteer their own time, and no public funds pay their salary while they engage in any religious activities. Nor is there any indication in this record that this program was established for the purpose of, or in order to facilitate, religious worship, exercise or instruction. Pierce County appears to be indifferent whether such services are offered. Accordingly, we hold that public funds are not used, employed, or devoted to religious worship, exercise or instruction.

Despite plaintiff's repeated characterizations, the Sheriff's Department chaplaincy program is not a "Christian ministry." The chaplaincy program is not a program which promotes or sponsors "religious worship, exercise or instruction." The purpose of the program is "to serve the crisis intervention needs of the law enforcement personnel of Pierce County, their families, and the citizens of [Pierce] [C]ounty who are the victims of crime." As defined by contract, the duties of chaplains include: crisis intervention for field police, including plain clothes officers; crisis intervention for correctional officers; crisis intervention regarding officer involved shootings; crisis intervention as it relates to law enforcement family dynamics; major street crime victim counseling; death notification with attendant counseling; and critical incident stress debriefing.

The uncompensated volunteer status of the chaplains distinguishes this case from prior Washington cases. For example, in *Witters* II, the court disapproved of the use of public funds for educational assistance to a visually hand-

icapped student because the student would use the funds to obtain a religious education:

> [T]he applicant is asking the State to pay for a religious course of study at a religious school, with a religious career as his goal. This falls precisely within the clear language of the state constitutional prohibition against applying public moneys to any religious instruction.[42]

In other cases, our supreme court has consistently struck down any program under which public funds were provided to students to pay for religious instruction.[43] Here, by contrast, no public funds pay for any religious instruction, worship or exercise.

Our supreme court has similarly struck down programs in which religious instruction was aided or promoted by state employees. Thus, the court disapproved of a program under which students received high school credit for private study of the Bible, because "the time of the teachers, as well as their technical skill, will be consumed while under the pay of the state in furnishing the syllabus or outline, the conducting of examinations, the rating of papers, and the determining of proper credits."[44] Similarly, the court disapproved of a released-time program under which students were released from public school to study religion at nearby churches; the released-time program violated section 11 because public school employees explained the program to students and distributed authorization cards on school property, thus applying public money and property to religious instruction.[45] The chaplaincy program differs from both cases in that the chaplains are not paid employees and no public funds are applied to any religious counseling.

The prior cases involving religious education are based

[42]*Witters* II, 112 Wn.2d at 368.

[43]*Washington State Higher Educ. Assistance Auth. v. Graham*, 84 Wn.2d 813, 817, 529 P.2d 1051 (1974); *Weiss*, 82 Wn.2d at 211.

[44]*Frazier*, 102 Wash. at 380.

[45]*Perry v. School Dist. 81*, 54 Wn.2d 886, 898, 344 P.2d 1036 (1959).

on the underlying premise that the program to which public funds are applied is a *religious* program or activity.[46] These cases are not applicable because the chaplaincy program is not a religious program, rather it is a facially secular crisis intervention and counseling program.

Pierce County presented unrebutted evidence that psychiatrists treating persons in crisis must recognize that Americans are profoundly religious. A recent Gallup poll reports that ninety-four percent of all Americans profess to believe in God, and that eighty-one percent of the religiously active believe in life after death.[47] The American Psychiatric Association has adopted guidelines which state in part:

> It is useful for clinicians to obtain information on the religious or ideologic orientation and beliefs of their patients so that they may properly attend to them in the course of treatment.[48]

Pierce County presented evidence that psychiatrists may appropriately respond to a patient's expressed religious or spiritual need, or refer the patient to someone who shares the patient's religious tradition.

We hold that volunteer chaplains may inquire whether a person in crisis has spiritual or religious needs. Inquiries about religion do not constitute religious worship, exercise or instruction. If the person expresses spiritual or religious needs, the chaplains may attend to those needs if they deem themselves qualified, or may refer the person to another spiritual or religious counselor.

A volunteer chaplain's appropriate response to expressed religious needs does not constitute the application

---

[46]*See Witters* II, 112 Wn.2d at 365; *Graham,* 84 Wn.2d at 817; *Perry,* 54 Wn.2d at 896; *Visser v. Nooksack Valley Sch. Dist. 506,* 33 Wn.2d 699, 711, 207 P.2d 198 (1949); *Frazier,* 102 Wash. at 375-76, 380. *See also Weiss,* 82 Wn.2d at 211.

[47]G. Gallup, Jr., *The People's Religion: American Faith in the 90's* 45, 58-59 (1989).

[48]American Psychiatric Ass'n, Committee on Religion and Psychiatry, guidelines (Dec. 1989).

of public money to religious worship, exercise or instruction. First, secular psychiatrists recognize that such a response constitutes appropriate counseling without regard to religious exercise or worship. Second, no public money is expended for the religious worship or exercise apart from the totality of the crisis response program as a whole. The volunteer chaplain is not paid for the time spent counseling the person in crisis, and Pierce County does not expend any more or less money when the person expresses a religious need. Third, a contrary rule would honor form over substance and would fly in the face of common sense. We will not require a volunteer chaplain who is faced with an expressed spiritual need to discontinue counseling and to break off the encounter, perhaps returning later in an "unofficial" capacity as a clergyperson to respond appropriately to the person in crisis. Crises are not susceptible to such arbitrary and pointless distinctions.

The record is unclear whether volunteer chaplains limit themselves to determining the spiritual needs of a person in crisis and to offering religious guidance only when the person expresses a spiritual need. Nolta's affidavit suggests that volunteer chaplains might limit themselves in this way when he states that they "are trained and instructed not to force a specific religious or ideologic agenda on person[s] in crisis but to have empathy for their sensibilities and particular beliefs." Nolta also states:

> Chaplains in their service to the Sheriff's Department never impose their personal religious beliefs on those in distress and do not work to see that a person in crisis accept those or any spiritual or ideological beliefs where they do not already have such a tradition or belief or are opposed to such a belief.

Granting all reasonable inferences to plaintiff as the non-moving party on summary judgment, a material issue of fact remains whether the volunteer chaplains offer unsolicited religious counsel. We reverse and remand for determination of this factual issue.

■ Plaintiff also complains of the use of public funds

to send out letters soliciting contributions for the TPCC, and of the screening of a TPCC promotional videotape to law enforcement personnel during working hours. Such contributions would pay the expenses of the TPCC, and would arguably ultimately be applied to religious worship, exercise or instruction, or to the support of a religious establishment. It might violate section 11 for Pierce County to send letters soliciting support for the TPCC and to show the video to county personnel while on duty, but it is unclear from the record whether the County continues to engage in these practices. Plaintiff brought this action as a taxpayer. Taxpayers may have standing to challenge unconstitutional governmental action, but as the Washington State Supreme Court held in *Moran v. State*,[49] "Before one may attack the constitutionality of the statute he must have a sufficient direct interest in and be damaged by the statute sought to be attacked." *Moran* cited the United States Supreme Court's decision in *Flast v. Cohen*,[50] which described taxpayer standing as follows:

> The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power. Such an injury is appropriate for judicial redress, and the taxpayer has established the necessary nexus between his status and the nature of the allegedly unconstitutional action to support his claim of standing to secure judicial review.[51]

Plaintiff's tax money "is being extracted and [arguably] spent in violation of specific constitutional protections" only insofar as Pierce County continues to allow TPCC to raise funds from deputies while on duty. We reverse and remand to determine whether the County continues to assist TPCC's fund-raising efforts. If these practices continue,

[49]88 Wn.2d 867, 871, 563 P.2d 758 (1977).

[50]*Id.* at 871 (citing *Flast v. Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968)).

[51]392 U.S. at 106.

the superior court will determine whether the practices violate section 11.

### Application or Appropriation of Public Funds or Property to the Support of any Religious Establishment

Section 11 also prohibits the appropriation or application of public money or property to "the support of any religious establishment." We hold that Pierce County has not *appropriated* public funds or property to the support of any religious establishment, but factual issues preclude summary judgment whether the County has *applied* funds to a religious establishment.

We hold there is no *appropriation* of funds to religious establishment because the Pierce County personal services contract prohibits the TPCC from discriminating against employees—and we interpret this to include all volunteer chaplains—on the basis of "creed." No religion is "established" in preference of any other. Indeed, the contract requires TPCC to accept volunteer chaplains even if they profess no creed at all.

We cannot tell, however, whether public funds have been *applied* to the support of a religious establishment because Nolta has given descriptions of the chaplaincy program which are inconsistent with one another and with the personal services contract. Nolta initially testified by deposition that all volunteer chaplains are from Christian churches because he views the chaplaincy as a "Christian ministry." Nolta's views and the apparent result of those views are inconsistent with the Pierce County contractual requirement that Nolta accept volunteers without regard to creed. Nolta later stated in an affidavit that he would work with any counseling organization—religious or secular—and "would expect them to work with the current chaplains on an equal footing." Assuming this is true, it is still inconsistent with the contract, which requires TPCC to accept individual volunteers, not to work equally with other organizations. On summary judgment, we cannot ignore Nolta's earlier deposition testimony.

We reverse and remand to the trial court to determine whether the chaplaincy program is being operated consistently with the contract. The trial court shall decide whether to enjoin any practices as inconsistent with the Pierce County contract.

■■■ We reject any argument that the chaplaincy program is unconstitutional simply because Pierce County has contracted with a religious organization. Section 11 does not prevent the state from contracting with a religious organization to provide secular services.[52] Such a construction of section 11 would evidence an affirmative hostility toward religion, a hostility which is not required under the state constitution. As our Supreme Court has stated:

> Our state constitution like that of the United States and every state in the Union, by the language used, indicates the framers were men of deep religious beliefs and convictions, recognizing a profound reverence for religion and its influence in all human affairs essential to the well-being of the community. Our Preamble reads as follows:
>
> > "We, the people of the State of Washington, *grateful to the Supreme Ruler of the Universe* for our liberties, do ordain this constitution." (Italics ours.)
>
> It was never the intention that our constitution should be construed in any manner indicating any hostility toward religion. Instead, the safeguards and limitations were for the preservation of those rights.[53]

The United States Supreme Court has also emphasized that religious organizations are not "disabled by the First

---

[52]*Accord Community Council v. Jordan,* 102 Ariz. 448, 451, 456, 432 P.2d 460, 463, 468 (1967) (holding reimbursement to a religious institution, the Salvation Army, for emergency services expenditures permissible under article II, section 12 of Arizona constitution, an identical provision to article I, section 11).

[53]*Perry,* 54 Wn.2d at 897 (citation omitted).

Amendment from participating in publicly sponsored social welfare programs."[54]

In summary, a State agency or subdivision of the State may contract with a religious organization to provide secular services. If the individual providers of counseling or crisis intervention services volunteer their services and are not compensated for their time, they may inquire of the spiritual and religious needs of the persons they serve, and may offer religious worship, exercise and instruction in response to an expressed need. But the state agency or subdivision must remain religiously neutral by accepting individual volunteer providers without regard to their religious beliefs or creed.

### First Amendment to United States Constitution

We now determine whether the Sheriff's Department chaplaincy program violates the Establishment Clause of the First Amendment of the United States Constitution. In 1971, the United States Supreme Court began to analyze Establishment Clause challenges under the three-part test first described in *Lemon v. Kurtzman*.[55] To pass the *Lemon* test, a statute or practice which touches upon religion must: (1) have a secular purpose; (2) neither advance nor inhibit religion in its principal or primary effect, and (3) not foster an excessive entanglement with religion.[56]

It appears from recent cases that a majority of the United States Supreme Court no longer relies on *Lemon* for a unitary test for all Establishment Clause cases. Three recent Establishment Clause cases have been decided without majority reliance on *Lemon*.[57] At least three of

---

[54]*Bowen v. Kendrick*, 487 U.S. 589, 609, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988).

[55]403 U.S. at 612-13.

[56]*Id.* at 612-13.

[57]*Rosenberger v. Rector & Visitors of Univ. of Va.*, ___ U.S. ___, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) (Kennedy, J.); *Board of Educ. v. Grumet*, 512 U.S.

the current members of the Court have directly expressed their reluctance to use *Lemon,*[58] while Justice O'Connor has called for a "less unitary approach" to the Establishment Clause:

> If each test covers a narrower and more homogeneous area, the tests may be more precise and therefore easier to apply. There may be more opportunity to pay attention to the specific nuances of each area. There might also be, I hope, more consensus on each of the narrow tests than there has been on a broad test.[59]

 For three reasons, we conclude that the United States Supreme Court would not apply the *Lemon* test to a police chaplaincy. First, the only Supreme Court case to analyze a chaplaincy, *Marsh v. Chambers,*[60] did not use the *Lemon* test, but instead employed an historical analysis, reasoning that the consistent use of legislative chaplaincies and the practice of opening legislative sessions with prayer shed light on the intent of the drafters of the First Amendment and have "become part of the fabric of our society."[61] (We do not suggest that police chaplaincies, like legislative chaplaincies, have such a long history that they are part of the fabric of society, only that the Court declined to use the *Lemon* test in the only chaplaincy case it has considered.) Second, *Lemon* was developed in the context of the schools, which has historically been a major concern of the Establishment Clause. This heightened concern extends to public aid to private sectarian schools as in *Lemon,* and to religious influences in the public schools, as in the school prayer

687, 114 S. Ct. 2481, 129 L. Ed. 2d 546 (1994) (Souter, J.); *Zobrest v. Catalina Foothills Sch. Dist.* 509 U.S. 1, 113 S. Ct. 2462, 125 L. Ed. 2d 1 (1993) (Rehnquist, C.J.).

[58]*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S. Ct. 2141, 2149-50, 124 L. Ed. 2d 352 (1993) (Kennedy, J., concurring; Scalia, J., concurring, joined by Thomas, J.).

[59]*Grumet,* 114 S. Ct. at 2500 (O'Connor, J., concurring)

[60]463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983).

[61]463 U.S. at 792.

cases.[62] Third, as discussed above, a majority of the Court has broken away from the *Lemon* test in recent Establishment Clause cases.

Justice Kennedy's 1995 majority opinion in *Rosenberger* synthesizes the Court's recent decisions and guides our Establishment Clause analysis of the Sheriff's Department chaplaincy program. The majority held that the Establishment Clause did not prevent the University of Virginia from collecting a mandatory student activity fee from all students and disbursing funds to meet the expenses of a variety of student groups, including a magazine offering a "Christian perspective" on issues of interest to university students. Justice Kennedy used a three step analysis. First, just as under *Lemon*, the program must have a secular purpose:

> If there is to be assurance that the Establishment Clause retains its force in guarding against those governmental actions it was intended to prohibit, we must in each case inquire first into the purpose and object of the governmental action in question . . . .[63]

Second, the program must be neutral to all religions:

> A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion.[64]

Third, there must be "no real likelihood that the speech [or religious practice] in question is being either endorsed or coerced by the State."[65]

The practices found constitutional in recent cases all satisfied these three tests. In *Lamb's Chapel*, a school

---

[62]*E.g., Lee v. Weisman*, 505 U.S. 577, 592, 112 S. Ct. 2649, 2658, 120 L. Ed. 2d 467 (1992) ("As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").

[63]*Rosenberger*, 115 S. Ct. at 2521.

[64]*Rosenberger*, 115 S. Ct. at 2521.

[65]*Rosenberger*, 115 S. Ct. at 2523.

district's policy of opening its premises for after-hours social, civic and recreational activities, including showing a film on child rearing based on religious content: (1) had a secular purpose of making public school facilities available to all; (2) was neutral ("all religions and all uses for religious purposes are treated alike . . ."); and (3) involved no coercion because the film would not be shown during school hours, and "there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed . . . ."[66] In *Rosenberger*, use of mandatory student fees to fund a wide range of student publications, including a religious magazine: (1) involved "the government's provision of secular services for secular purposes on a religion-neutral basis"; (2) neutrally opened forums for all forms of speech, religious and nonreligious; and (3) created "no real likelihood that the speech in question is being either endorsed or coerced by the State . . . ."[67] In *Zobrest*, providing a sign-language interpreter to a deaf student to accompany him to parochial school: (1) had a clear secular purpose of assisting in the education of all handicapped children; (2) "is part of a general government program that distributes benefits neutrally to any child qualifying as 'handicapped' under [the statute], without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends"; and (3) the program involved no coercion or endorsement because, "James' parents have chosen of their own free will to place him in a pervasively sectarian environment."[68]

Inversely, the practices condemned in recent cases violated one of the three tests described above. In *Lee*, school graduation prayers by a Rabbi selected by school officials endorsed religion because the school created "a state-sponsored and state-directed religious exercise in a

---

[66]113 S. Ct. at 2146-48; *Id.* at 2147; *Id.* at 2148.

[67]115 S. Ct. at 2524; *Id.* at 2523-24; *Id.* at 2523.

[68]113 S. Ct. at 2465; *Id.* at 2467; *Id.* at 2469.

public school," and coerced students because the State "in a school setting, in effect required participation in a religious exercise."[69] In *Grumet*, creation of a special school district for a religious enclave of followers of a particular religious sect was not neutral because it delegated "the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally."[70].

We cannot determine from this record whether the chaplaincy program violates the Establishment Clause of the First Amendment, because we cannot tell whether it is neutral to all religions. As discussed above, the County's personal service contract requires religious neutrality, but factual disputes about the actual operation of the program preclude summary judgment. On remand, after determining whether the program actually will accept volunteer chaplains regardless of creed, the trial court can determine whether the program is religiously neutral.

█ It is a close question whether a police chaplaincy program improperly coerces or endorses religion. We note first that the Legislature has already implicitly passed on this question by enacting RCW 41.22.030 which authorizes law enforcement agencies to use the services of volunteer chaplains associated with an agency. The Legislature has implicitly rejected the idea that a volunteer chaplaincy improperly endorses religion, and we accordingly presume the program is constitutional.[71] Moreover, we do not examine the abstract notion of a chaplaincy program; we look instead to the manner in which this program is imple-

---

[69]112 S. Ct. at 2655; *Id.* at 2659.

[70]114 S. Ct. at 2487.

[71]*Washington Higher Educ. Facilities Auth. v. Gardner*, 103 Wn.2d 838, 843, 699 P.2d 1240 (1985) (applying, inter alia, article I, section 11) ("[A] party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute is invalid . . . ."); *see also Campos v. Department of Labor & Indus.*, 75 Wn. App. 379, 384, 880 P.2d 543 (1994) ("A challenged statute is presumed constitutional . . . ."), *review denied*, 126 Wn.2d 1004 (1995).

mented, or, as Justice Kennedy described the task in *Rosenberger,* "the practical details of the program's operation."[72] Justice O'Connor aptly observed in her concurring opinion in *Rosenberger:*

> Reliance on categorical platitudes is unavailing. Resolution instead depends on the hard task of judging— sifting through the details and determining whether the challenged program offends the Establishment Clause. Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case.[73]

The Pierce County program presents some danger of endorsement, for the volunteer chaplains present themselves as representatives of the sheriff and they are provided sheriff's jackets and sheriff's identification. The danger of endorsement is mitigated, if not eliminated, however, by fact that the chaplains serve as volunteers, and by Nolta's assertion that the chaplains: refrain from disseminating church literature or business cards; seek to place subjects in touch with their own spiritual or sectarian counselor; and offer to pray, read scripture or discuss theology only at the request of the subject. We hold, however, that Nolta's affidavit fails to establish that the chaplains always follow these practices, and remand for a determination of the manner in which the volunteer chaplains actually conduct themselves. The trial court can then determine whether the program presents any real danger that the County is endorsing or coercing religion. The facts distinguish this case from the only reported case to have considered a police chaplaincy, the 1980 decision of the United States District Court for the Western District of North Carolina in *Voswinkel v. City of Charlotte.*[74] In *Voswinkel,* a local Baptist church contracted with the city to provide a minister to act as chaplain to police officers and the general public. By the terms of the

---

[72]115 S. Ct. at 2521.

[73]115 S. Ct. at 2525-26.

[74]495 F. Supp. 588 (W.D.N.C. 1980).

contract, the chaplain was not to engage in religious instruction or to conduct any religious services while acting in his capacity as police chaplain.[75] The chaplain was paid jointly by the city and the church.[76] The court found that the church/city contract failed the *Lemon* test in several ways. First, the contract had a primary effect of aiding religion because (1) it provided for a publicly funded position, which, under the terms of the contract, had to be filled by a "minister"; (2) it afforded a particular church a superior opportunity to disseminate its religious views to members of the police department and created an appearance of religious favoritism; and (3) by permitting the chaplain to provide religious guidance to those who requested it, the contract had the effect of financing the provision of expressly religious benefits primarily to those who would be inclined to seek the guidance of a Baptist minister.[77] The court also found that the contract threatened excessive entanglement with religion by failing to clearly separate the chaplain's duties as a city employee and as a church employee, by requiring enforcement of the prohibition against unsolicited religious worship and instruction, and by inviting competition between churches for the provision of chaplaincy services.[78] The Sheriff's Department chaplaincy program differs substantially from the Charlotte contract, using volunteer chaplains selected through neutral criteria and accepting chaplains of any or no faith.

We reverse and remand for further proceedings consistent with this opinion.

FLEISHER, J., concurs.

SEINFELD, C.J. — I concur in the majority's result and

---

[75]*Id.* at 590-91.

[76]*Id.* at 592.

[77]495 F. Supp. at 595; *Id.* at 596; *Id.* at 596-97.

[78]495 F. Supp. at 597-99.

with its analysis of section 11 of the state constitution. I write separately to express my disagreement with the majority's first amendment analysis and its avoidance of the three-part *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971) test.

Because the United States Supreme Court, to date, has not overruled or limited the application of *Lemon* to the public school context, I believe that it is premature for us to do so. Further, *Lemon*'s focus on whether the challenged practice (1) has a secular purpose; (2) neither advances nor inhibits religion in its principal or primary effect; and (3) fosters excessive entanglement with religion appears well-suited to an analysis of the chaplaincy program before us.

For the most part, the differences between the *Lemon* test and the test that J. Kennedy articulates in *Rosenberger v. Rector & Visitors of Univ. of Va.*, ___ U.S. ___, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995), are not significant to the facts in this case. The first question, whether the program has a secular purpose, is identical under *Lemon* and *Rosenberger*, and I agree that the overall secular purpose of the program is not in dispute.

The second question in *Lemon* is very similar to *Rosenberger*'s second question: is the practice neutral toward and among religions? Nolta's statement that volunteers must be "certified" pastors raises questions of neutrality both to and among religions. And evidence that Tacoma Pierce County Chaplaincy (TPCC) has solicited sheriffs' staff for support and that volunteer chaplains have engaged in unsolicited religious encounters with crime victims raises questions regarding the County's endorsement of religious activities.

This case is distinguishable from the three the majority cited where the United States Supreme Court applied the analysis set forth in *Rosenberger* and found no violations. Nor were there issues of disputed material facts in those cases. In *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993) the only connection between the challenged

religious activity and the school district was that the activity occurred on school premises. Unlike the chaplaincy program, the school did not contract for the program or control it in any way. It did not encourage school children or staff to attend or participate.

In *Rosenberger*, the challenged religious publication was only one of many publications. There was no evidence that the religious publication received any special benefit not available to all. The disputed facts here suggest the opposite. The County contracted with TPCC, and TPCC controls who may be a volunteer and the activities of the volunteers. TPCC is not merely one of several groups available to provide counseling to those in need.

Likewise, *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S. Ct. 2462, 125 L. Ed. 2d 1 (1993) involved a hearing impaired student who wished to be treated like all other students; he did not seek special favors. The Supreme Court found that his enrollment in a religious school did not mean that he could not receive the same benefits available to those in nonreligious schools. Here, there is no contention that the County is preventing religiously affiliated persons from serving alongside those without such an affiliation. Rather, it is the opposite. Thus, *Zobrest* is inapposite.

The facts and inferences from those facts in this case appear more analogous to *Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 114 S. Ct. 2481, 2486 n.2, 129 L. Ed. 2d 546 (1994). The authorities in *Grumet* appeared motivated by a desire to meet a unique religious group's special needs. As here, no one complained that the challenged practice discriminated against them.[79] Nonetheless, the *Grumet* court held that the program endorsed religion and thus did not pass constitutional muster.

---

[79]Respondents in *Grumet* brought their constitutional challenge as individual taxpayers and as members/officers of the State School Board Association. The lower court held that the association lacked standing; thus, the Supreme Court reviewed the case solely on the basis of respondents' taxpayer standing. *Grumet*, 114 S. Ct. 2486 n.2.

The most significant distinction between the *Rosenberger* and *Lemon* tests is in question three. Rather than look for *Lemon*'s excessive entanglement, *Rosenberger* examines the challenged activity to determine if it involves government coercion or endorsement of religious practice. This, essentially, is a rephrasing of its second question regarding the government's neutrality toward and among religions. *Lemon*'s excessive entanglement question demands a closer examination of the relationship in its entire context.

For example, if the County, to assure itself that TPCC volunteers do not engage in coercive practices with counseling service recipients, maintains an ongoing scrutiny of the volunteer chaplains' religious practices, the result could be excessive entanglement.

As the majority notes, there are facts in dispute regarding the program's religious neutrality that the trial court must find before deciding whether the program endorses or coerces religious practices. I believe there is an additional question as to whether the TPCC contract, as implemented, fosters excessive government-religion entanglement. The trial court should make the necessary findings and conclusions to resolve this question. I agree that we must remand the matter to the trial court for fact-finding and for a conclusion, based upon those facts, of the program's constitutionality under both the state and federal constitutions.

Reconsideration denied November 3, 1995.

Review granted at 129 Wn.2d 1004 (1996).