[No. 63664-8. En Banc.]

Argued June 26, 1996. Decided April 24, 1997.

HARLAND MALYON, *Petitioner*, v. PIERCE COUNTY, *Respondent*.

*Albertson Law Offices*, by *Dan M. Albertson*, for petitioner.

*John W. Ladenburg, Prosecuting Attorney*, and *Daniel R. Hamilton, Deputy*, for respondent.

SANDERS, J. — Harland Malyon claims the Pierce County Sheriff's Department's chaplaincy program violates his religious freedom because it appropriates or applies public funds or property for religious purposes contrary to Washington Constitution article I, section 11 (amend. 88) and/or establishes a religion contrary to the First Amendment of the United States Constitution. The trial court dismissed Malyon's claim on summary judgment. The Court of Appeals reversed and remanded with instructions to determine disputed facts.[1] We affirm the trial court's dismissal and reverse the Court of Appeals' remand, concluding disputed facts are not material.

Essentially the issue is whether a counseling program secular in purpose and on its face, but occasionally involving some consensual religious activity by unpaid volunteers, is a prohibited appropriation of public funds or property or establishes a state religion. We hold it does not violate the state constitution because the religious activities in question are not at public expense, and it does not violate the federal constitution because it is not an excessive religious entanglement.

While the state and federal texts differ substantially, both affirm the individual's right to free religious exercise while (or by) denouncing governmental involvement as a means to that end. These clauses are complementary, not contradictory. They promote the single purpose summarized by the very title of the state constitutional section at issue: religious freedom.

Mr. Malyon claims no special injury. Rather he asserts his tax dollars are expended for an unconstitutional purpose. We consider the question in complete agreement with Thomas Jefferson's warning "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical

---

[1]*Malyon v. Pierce County*, 79 Wn. App. 452, 478, 479, 903 P.2d 475 (1995), *review granted*, 129 Wn.2d 1004, 914 P.2d 66 (1996).

. . . ."[2] while recalling "it was never the intention that our constitution should be construed in any manner indicating hostility toward any religion."[3] However, if Mr. Malyon's tax dollars have not been appropriated or used for a religious purpose, he has no cause for state constitutional complaint.

■■ To properly protect Mr. Malyon's rights we must first carefully consider the facts in a manner most favorable to his claim as that is the summary judgment standard of review.[4] We therefore assume, for the purpose of this opinion, that one or more of these chaplains may have engaged in "religious worship, exercise or instruction" as those terms are used in article I, section 11 during the course of his or her activities. We disagree with the dissent, however, that such conduct by volunteers violates the rights of Mr. Malyon in any way. Our responsibility is not to purge religion from society; it is to protect each citizen's constitutional right to religious liberty.

Nor do we agree with the broad sweep of the dissent which goes beyond the constitutional text to disapprove of religious activity even when not a result of the appropriation of public money or property. Most fundamentally we disagree such an approach serves the purpose of religious freedom—which is, in the final analysis, to protect free

---

[2]Thomas Jefferson, *Preamble* to the *Virginia Bill for Religious Liberty* [passed in the Assembly of Virginia in 1786] (quoted in *Everson v. Board of Educ. of Ewing Township*, 330 U.S. 1, 13, 67 S. Ct. 504, 510, 91 L. Ed. 711, 168 A.L.R. 1392 (1947) (citing 12 WILLIAM WALLER HENING, STATUTES OF VIRGINIA 84 (1823); HENRY STEELE COMMAGER, DOCUMENTS OF AMERICAN HISTORY 125 (1944))).

The Act for Religious Freedom was one of the three great accomplishments of Jefferson which he wished remembered in his epitaph, along with the Declaration of Independence and founding the University of Virginia. THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON at xx-xxi (Adrienne Koch & William Peden eds., 1972).

[3]*Malyon*, 79 Wn. App. at 483 (citing *Perry v. School Dist. No. 81*, 54 Wn.2d 886, 897, 344 P.2d 1036 (1959)).

[4]*Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995) (in reviewing summary judgment the court considers facts "in a light most favorable to the nonmoving party").

religious exercise, not prohibit or compel it. Verbos memini, si numero tenerem.[5]

The dissent's claim that the conduct at issue "endorses" a religious establishment, even absent the use of funds, contrary to the First Amendment is considered, and rejected, in light of *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).

## *Facts*

Since 1984 the Pierce County Sheriff's Department has used volunteer chaplains as counselors. However, no funds were or are appropriated to pay these volunteers. That is the singularly most important undisputed fact of all. The following year the state Legislature passed a statute explicitly authorizing the practice.[6] Therefore the constitutionality of this statute is also at issue.

The group currently providing the chaplains is the Tacoma-Pierce County Chaplaincy (TPCC), a nonprofit Christian ministry, headed by Dan Nolta. It is funded by church, business, and individual donors, *not the government*. Nolta requires TPCC members be credentialed pastors of a local congregation willing to receive training in law enforcement crisis counseling. Of the 15 volunteers, 14 are credentialed ministers of various Christian denominations. TPCC is not affiliated with or connected to any particular church or denomination.

While TPCC is a nondenominational Christian organization, the sheriff's program is facially secular. TPCC offers services to the sheriff's department pursuant to contract.

---

[5](I remember the words, but not the tune.) By rephrasing we do no violence to Vergil's sentiment "numeros memini, si verbe tenerem" (I remember the tune but not the words). *Eclogues.* Ecl. ix, 1. 45. (37 B.C.).

[6]"The legislature authorizes local law enforcement agencies to use the services of volunteer chaplains associated with an agency," and "The duties of a volunteer law enforcement chaplain include counseling, training, and crises intervention for law enforcement personnel, their families and the general public." LAWS OF 1985, ch. 223, §§ 3, 4, codified as RCW 41.22.030 and .040, respectively.

In 1991, when the prior contract with TPCC expired, the sheriff's department openly requested bids from the general public to run the chaplaincy program. The request for bid proposals made no mention of religion, religious work, or religious qualifications. Instead, the request sought "the services of a volunteer organization with at least ten members qualified and available to serve the crisis intervention needs of the law enforcement personnel of Pierce County, their families, and the citizens of this county who are the victims of crime." Resp't's Clerk's Papers (RCP) at 68. The offering stated the "organization must be willing to work with no compensation, on a volunteer basis, the only exception being reimbursement for mileage, insurance coverage, loaned radios and office space for an appointed director to coordinate responses and programs." RCP at 70. TPCC submitted the only bid and executed a personal services contract.

Pursuant to contract, TPCC volunteers serve the sheriff's chaplaincy under the direction of the sheriff and are responsible solely to the sheriff and the director of the program. The volunteers do not serve as representatives of their respective denominations and are affirmatively prohibited from promoting their own denomination over any other. The record does not suggest they do so in practice. Further, the contract between the sheriff and TPCC expressly prohibits TPCC from discriminating against any of its employees or applicants on the basis of religion. Nolta has stated that if any other counseling organization, religious or not, offered its services and if such services were accepted by the sheriff's department, Nolta, as director of the sheriff's chaplaincy, would train, supervise, and work with it on an equal footing. There are no facts in the record to the contrary.

The chaplains' express duties further demonstrate the secular purpose of their work. They provide 24-hour death notification with attendant counseling for the sheriff's department and the county coroner. For example, the record shows a chaplain rather than a police officer notified

the parents of a boy who died in a car accident on the way to school.

The chaplain volunteers provide 24-hour crisis intervention counseling for victims of major crime as well. Sample beneficiaries of the counseling were a rape survivor and the family of a suicide victim.[7] The volunteers also help place people in shelters, notably victims of domestic abuse. While the majority of calls involve the public, the chaplains also conduct crisis intervention counseling for police officers and their family members.[8] The 15 chaplain volunteers serve on a 24-hour on-call basis without compensation.

It is uncertain from the record what portion of the private counseling is religious in nature. Nolta stresses

---

[7]The record also includes testimonial examples of the chaplains' work including:

"Principal: As principal of Spanaway Junior High School I wasn't at all prepared for what I discovered when I arrived at the school following the shooting. [A student had shot and killed two other students then committed suicide.] Kids and teachers were everywhere, crying and disoriented. Both the fire and police units were on the scene and media was there wanting more information. But fortunately, the chaplains of the Pierce County Chaplaincy were there ready to help in any way they could. They seemed to know just what to say to my students and staff and they helped me deal with the media and the emergency crews that were on the scene. In the days and weeks to follow, they continued to stand by everyone at Spanaway Junior High. They even organized a memorial service allowing the kids to come together to remember their friends . . . ." *Malyon*, 79 Wn. App. at 460-61.

[8]The record includes the following examples of such counseling:

"[Officer]: One day my partner and I responded to a domestic call out in the South end of Tacoma. Soon after we arrived on the scene I was attacked by a crazed, knife wielding man and in the struggle that followed, my partner was fatally shot to death by a bullet from my own revolver. To say the least, I came unglued. The week that followed seems like a blur now, but I do remember from the very beginning one of our police chaplains was there. Standing beside me, ready to help any way he could. In the weeks that, actually, from the time it started, they called or stopped by daily just to see how I was doing and to make sure everything was going smooth for me. And they even made arrangements for my partner's widow and I to meet and talk things over. I know now that without the chaplain's help, I couldn't have made it through this time of crisis in my personal life and in my career." *Malyon*, 79 Wn. App. at 461.

"Woman: My husband was a police officer and about a year ago he was killed in the line of duty. When they came to tell me that he had just died, I didn't know what to do or where to turn. I was so thankful that a police chaplain was there to help me . . . . They helped me deal with the news media and they helped me with all the funeral arrangements . . . ." *Id.* at 460.

that while TPCC is a Christian ministry, the sheriff's chaplaincy is not. According to Nolta, the chaplains generally perform nonreligious psychological counseling. Each volunteer chaplain is directed to use appropriate crisis intervention skills to meet the "emotional, physical and spiritual needs" of the community being served and to refer people to appropriate community resources as necessary. Indeed, Nolta describes what they do as 99 percent crisis intervention. Mark French, chief of law enforcement operations for the sheriff's department, states that the chaplain contacts he had witnessed had been "overwhelmingly secular" and involved no religious overtones.

However, some of the 900 reports filed by chaplains contain clearly religious references. For example, one report from 1987 reads: "Dealt with feelings of guilt and anger. She did not understand . . . why God would take her child. She felt better after we talked things through." Appellant's Clerk's Papers (ACP) at 315.

The County suggests all modern-day counseling necessarily has a spiritual component to better serve religious citizens. The American Psychiatric Association guidelines state: "It is useful for clinicians to obtain information on the religious or ideologic orientation and beliefs of their patients so that they may properly attend to them in the course of treatment." RCP at 111.

While each chaplain volunteers his time, the County provides modest material support to accomplish the chaplaincy's secular purpose. The County provides Nolta with an office in the sheriff's department's west precinct. Nolta also has use of a 1984 Chevrolet Citation, a sheriff's jacket for identification purposes at crime and emergency scenes, a bulletproof vest, and a police radio. Such items are generally issued to uniformed personnel. The volunteer chaplains are loaned police radios to enable them to report to crisis scenes and some, but not all, have sheriff's jackets for identification purposes. Initially, chaplains were given mileage reimbursement for traveling to calls, but such reimbursement was discontinued several years

ago. The County provides all chaplains with liability and medical insurance for liability incurred while responding to calls.[9] Such protects the County. The County supplies no other money or property to the program. The total actual expenditures from the County budget for the program have ranged from $1,000 to $5,000 per year, and average $3,000 per year.

The County asserts that it could not make use of the volunteer chaplains without supplying radios, liability insurance, and other minimal support. Malyon does not disagree. Further, the County stresses that it could not afford to purchase the services currently offered free of charge by the volunteers. The County clearly gets more out of this program than it financially invests. This is beyond dispute.

TPCC also provides similar chaplaincy services to 10 other Washington state and municipal agencies including the state patrol, the Tacoma police and fire departments and the medical examiner's office. Police forces throughout the nation utilize chaplains. In fact, the International Conference of Police Chaplains has members serving law enforcement agencies in 49 states.

Plaintiff Harland Malyon brought suit in Pierce County Superior Court, as a county resident and taxpayer, alleging the sheriff's department's use of volunteer chaplains constituted an establishment of religion prohibited by both the state and federal constitutions.

## Analysis

While the constitutional analysis must proceed separately under state and federal provisions, and we stress the differences for that purpose, we note religious freedom is the overall objective of each. Further, these clauses guarantee each individual's religious freedom will be

---

[9]By ordinance the county must provide insurance to all county volunteers. Pierce County Code, ch. 2.120.

protected. This mandates a view from the individual perspective.

## I. Washington State Constitution

■ Malyon challenges the chaplaincy program under both the state and federal constitutions. When a party asserts a right under both the state and federal constitutions, we analyze the state constitution first if the party adequately briefs the *Gunwall* factors. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986); *State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984); *State v. Young*, 123 Wn.2d 173, 178, 867 P.2d 593 (1994).

## A. Analysis Under Gunwall

Malyon has fully briefed the *Gunwall* factors and, accordingly, we will analyze whether the state constitution bears differently upon the issue than its federal counterpart. The Court of Appeals concluded that "[a]ll of the *Gunwall* factors favor an independent interpretation" of the state constitutional provision. *Malyon*, 79 Wn. App. at 475. We agree with the scholarly *Gunwall* analysis conducted by Judge Wiggins and agree, as does the dissent, that an independent interpretation is warranted.

■ This court has never conducted a *Gunwall* analysis of the relevant portion of article I, section 11. One is appropriate here.[10] Under *Gunwall*, there are six relevant nonexclusive neutral criteria which help determine whether the constitutional clause is intended to carry meaning different from its federal counterpart: (1) the textual language of the state constitution; (2) significant

---

[10]However, *Witters v. Commission for the Blind*, 112 Wn.2d 363, 368, 771 P.2d 1119, *cert. denied*, 493 U.S. 850, 110 S. Ct. 147, 107 L. Ed. 2d 106 (1989) (*Witters* II) held, without any *Gunwall* analysis, the state provision, in the educational context, to be "far stricter." In *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 224, 840 P.2d 174 (1992) we conducted a *Gunwall* analysis concerning the free exercise clause of the state constitution and concluded it is "significantly different and stronger than the federal constitution."

differences in the texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) differences in structure between the federal and state constitutions; and (6) matters of particular state interest or local concern. *Gunwall*, 106 Wn.2d at 61-62.

*1. Textual language of the state constitutional provision and significant differences between that of its federal counterpart*

Article I, section 11 provides:

**Religious freedom**

Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. *No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment: PROVIDED, HOWEVER, That this article shall not be so construed as to forbid the employment by the state of a chaplain* for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice, as in the discretion of the legislature may seem justified. No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror, in consequence of his opinion on matters of religion, nor be questioned in any court of justice touching his religious belief to affect the weight of his testimony.

CONST. art. I, § 11 (emphasis added).

The relevant portion of the First Amendment to the United States Constitution mandates:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

The text of article I, section 11 significantly differs and is considerably more specific. The state provision explicitly prohibits appropriation or application of public money or property for four explicit purposes, religious worship, religious exercise, religious instruction, and support of any religious establishment. The federal clause refers generally, almost cryptically, to laws respecting religion. In all, we have characterized the state provision as different from its federal counterpart as it is both " 'sweeping and comprehensive' " in the area of public education. *Witters II*, 112 Wn.2d at 370 (citing *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 375, 173 P. 35 (1918)). We agree with the Court of Appeals that "[t]he language of section 11 alone virtually demands an interpretation different from the First Amendment." *Malyon*, 79 Wn. App. at 468.

The text remains unchanged from that which was originally ratified at statehood in 1889 except the proviso which was added by amendment 4 in 1904 and slightly altered by amendment 34 in 1958 and amendment 88 in 1993 relating to chaplains employed for various state institutions at public expense. Such proviso states the "article shall not be so *construed*" to forbid employment of a chaplain for state custodial, correctional, and mental institutions as the Legislature may so provide. (Emphasis added.)

Article IX, section 4 is related to article I, section 11 and adds special and unique emphasis to the subject of religion in public schools:

> All schools maintained or supported wholly or in part by public funds shall be forever free from sectarian control or influence.

CONST. art. IX, § 4.

And article XXVI makes the same point:

> **Fourth.** Provision shall be made for the establishment and maintenance of systems of public schools free from sectarian control which shall be open to all the children of said state.

Const. art. XXVI.

Proper analysis of article I, section 11 must distinguish similar provisions solely applicable to public schools, and concerns unique to public schools, when schools are not at issue.

### 2. State constitutional and common law history

The treatment given religion during the state constitutional convention demonstrates religious concerns and outlooks significantly differed from those motivating the First Amendment a century before.

■ The driving concern of the state constitutional convention was religious influence in, and control over, public education.[11] The Enabling Act carried a strict requirement that the new state constitution include a stern separation of church and public education clause.[12] As noted, the resulting state constitution contains three separate prohibitions of religious involvement in public education.[13] By contrast the First Amendment, drafted with fresh memories of the Church of England, resulted from the distinctly different concern to prevent the

---

[11]*See generally* Robert F. Utter & Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution*, 15 Hastings Const. L.Q. 451, 473 (1988).

[12]Enabling Act, ch. 180, § 4 (25 Stat. 676 (1889)). *Also see* Frank J. Conklin & James M. Vaché, *The Establishment Clause and the Free Exercise Clause of the Washington Constitution—A Proposal to the Supreme Court*, 8 U. Puget Sound L. Rev. 411, 441 (1985) ("The thrust of the enabling act and its history was that proposed states could not gain admission to the Union unless the people adopted [a clause] in their proposed constitutions that would outlaw any form of public assistance to schools under sectarian control or influence. A brief look at the Washington State Constitution illustrates the consequences of such a demand."). For a thorough analysis, *see* Utter & Larson, *supra* at 473.

[13]Article IX, section 4 ("All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence."); article XXVI ("**Fourth.** Provision shall be made for the establishment and maintenance of systems of public schools free from sectarian control which shall be open to all the children of said state."); and article I, section 11 ("No public money or property shall be appropriated for or applied to . . . any religious instruction."). *See* Utter & Larson, *supra* at 473 (article I, section 11 did little more than "address[ ] the basic objective of the Blaine Amendment: preventing state funding for parochial education or activities.").

establishment of a *national* religion and to keep the national government from interfering with the religious establishments of the several sovereign states.[14] This difference also suggests the state constitutional clause was not intended to be identical to its federal counterpart.[15]

█ Our precedent since constitutional ratification is consistent with the conclusion that article I, section 11 is focused on religious influence in public education. Numerous cases have held the prohibition on religious influences in schools is "sweeping and comprehensive." *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 375, 173 P. 35 (1918).

While circumstances motivated the drafters to take a strict stance on religion in schools, evidence suggests a friendlier accommodation to religion elsewhere. After deliberate debate[16] the constitutional drafters adopted a Preamble which gave thanks to the "Supreme Ruler of the Universe."[17] Delegate Buchanan, noting that the federal constitution lacks any reference to the Divine, opined that "[n]o matter what Congress did, the colonies set the example. They recognized the Creator by frequently devoting days to thanksgiving and humiliation for the blessings bestowed upon them."[18] Scholars note "[f]ar from being hostile to religion, the framers [of the Washington Consti-

---

[14]Madison, a strict disestablishmentarian, strongly believed the issue of religious establishments was solely up to the states as he declared: "There is not a shadow of right in the general [national] government to intermeddle with religion. Its least interference with it would be a most flagrant usurpation." 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 204 (Elliot 2d ed., 1836). *See also* n.27, *infra.*

[15]We also note that the drafters could have copied the federal establishment clause yet the fact that they did not and instead used significantly different language supports the proposition that their concerns and intentions were different.

[16]*See* JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, *1889* at 7-9 (Beverly P. Rosenow ed., 1962).

[17]The Preamble of the Washington Constitution states in its entirety: "We the people of the State of Washington, grateful to the Supreme Ruler of the Universe for our liberties, do ordain this constitution."

[18]*The Constitution: Shall the Constitution Recognize the Deity*, SEATTLE POST-INTELLIGENCER, July 30, 1889, at 1.

tution] viewed religion as an important component of a stable society."[19]

The framers of article I, section 11 were also well aware religious societies in Washington commonly provided social services to the public. Indeed, reference to the health care work provided by the Sisters of Providence appears in the debates themselves.[20] Religious orders operated nearly all hospitals within the State. Many religious groups received state funding through public service contracts.[21] For example in 1877 the Sisters of Providence favorably responded to a bid proposal by King County by establishing the first hospital in Seattle.[22] Other religious groups were particularly active in providing other public services such as orphanages and poor houses.[23] The drafters were aware of this practice.

One of the first acts of the framers was selection of a chaplain paid $1.50 per day at public expense to commence each convention session with prayer.[24] By contrast, the United States constitutional convention never opened its sessions with prayer.[25]

■ Last, this very article of the state constitution has

---

[19]Utter & Larson, *supra* at 477.

[20]*See Malyon*, 79 Wn. App. at 469 (noting that the constitutional delegates discussed the work of the Sisters of Providence in relation to tax exemption for religious property).

[21]DAVID M. BUERGE & JUNIUS ROCHESTER, ROOTS AND BRANCHES: THE RELIGIOUS HERITAGE OF WASHINGTON STATE 141 (1988).

[22]ELLIS LUCIA, SEATTLE'S SISTERS OF PROVIDENCE: THE STORY OF PROVIDENCE MEDICAL CENTER—SEATTLE'S FIRST HOSPITAL 21-22 (1978). *Also see* BUERGE & ROCHESTER, *supra* at 141 (chronicling how the Sisters of Providence opened the first hospital in the territory in 1858 and continued to open hospitals in the years leading up to the constitutional convention).

[23]BUERGE & ROCHESTER, *supra* at 141.

[24]JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, *supra* at 7-9.

[25]*Malyon*, 79 Wn. App. at 469-70 (citing LEO PFEFFER, CHURCH, STATE AND FREEDOM 122 (1967 rev. ed.)).

been amended to include a *rule of construction*[26] that specifically allows use of state salaried religious chaplains at state custodial, correctional, and mental institutions as well as any state hospital or health care facility. CONST. art. I, § 11 (amends. 4, 34, 88). We stress the voters clearly directed us, by constitutional amendment, to *construe* the original language of the entire article to be consistent with the state hiring, employing, and paying the salary of chaplains in some state facilities.

### 3. Remaining Gunwall factors

The remaining three *Gunwall* factors (preexisting state law, differences in structure between state and federal constitutions and matters of particular state and local concern) do not shed significant light on our inquiry.

The fourth factor, preexisting state law, usually pertains to state law preexisting ratification and for that reason is nondispositive here. We do note, however, various governmentally sanctioned religious practices mentioned in the preceding section preceded constitutional ratification and are, therefore, relevant.

■ The fifth factor, the differences in structure between state and federal governments, "always favors an independent state interpretation." *Richmond v. Thompson*, 130 Wn.2d 368, 922 P.2d 1343, 1350 (1996). This factor is most valuable when the differences between the federal and state government are relevant and can be articulated. Certainly factors of federalism are indicative of different considerations served by the First Amendment than by article I, section 11.[27]

---

[26]"[T]his article shall not be so construed as to forbid the employment by the state of a chaplain for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice, as in the discretion of the legislature may seem justified." CONST. art. I, § 11 (amend. 88).

[27]Prior to application of the federal establishment clause through the Fourteenth Amendment to the states in *Everson v. Board of Educ. of Ewing Township*,

■ ■ The sixth factor reminds us nearly everything is local in nature.[28] Certainly the Court of Appeals correctly concluded that county law enforcement chaplains are no exception.[29]

■ In summary, the significant differences in the texts and purposes of the constitutional provisions in addition to Washington's constitutional history amply support the conclusion that article I, section 11 should be read independently from the establishment clause of the Federal Constitution in the chaplaincy context. However, where that independence leads is a different question.[30]

---

330 U.S. 1, 15, 67 S. Ct. 504, 91 L. Ed. 711, 168 A.L.R. 1392 (1947), differences in structure would have been critical in an establishment clause case. Many scholars agree that the federal establishment clause was intended to: (1) prohibit Congress from establishing a national church; and (2) prohibit Congress from interfering with "or trying to dis-establish" any state religious establishments. Akhil Reed Amar, *The Bill of Rights as a Constitution,* 100 YALE L. J. 1131, 1157 (1991). Massachusetts, for example, had an established state religion until 1833. Thus, the establishment clause was truly a restraint on federal power vis-á-vis state sovereignty and may have been a perfect example of the proper use of the fifth *Gunwall* factor. *See also* footnote 14, *supra.*

[28]*See, e.g., State v. Gocken,* 127 Wn.2d 95, 105, 896 P.2d 1267 (1995) ("The need to protect the double jeopardy rights of Washington citizens is correctly a state concern."); *Richmond v. Thompson,* 130 Wn.2d 368, 922 P.2d 1343 (1996) (law enforcement is of particular local concern); *State v. Johnson,* 128 Wn.2d 431, 446, 909 P.2d 293 (1996) ("privacy interests are matters of particular state interest"). We note that *Gunwall* cited *Coyle v. Smith,* 221 U.S. 559, 31 S. Ct. 688, 55 L. Ed. 853 (1911) as an illustration of an issue of particular local concern. *Gunwall,* 106 Wn.2d at 62 n.11. *Coyle* involved the selection of the location of a state capital, an issue clearly of state concern where issues of national uniformity are not at issue.

[29]*Malyon,* 79 Wn. App. at 474. In contrast *First Covenant Church of Seattle,* 120 Wn.2d at 225, construed the state free exercise clause independently to hold "[f]ree exercise of religion is not a local concern."

[30]*See* Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind,* 5 ST. THOMAS L. REV. 49, 50 (1992) ("However useful that floor-ceiling metaphor may be, it obscures the larger truth that the level of protection of rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution. The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand.").

## B. Analysis under article I, section 11

██ ██ Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well.[31] The text necessarily includes the words themselves, their grammatical relationship to one another, as well as their context. Our objective is to define the constitutional principle in accordance with the original understanding of the ratifying public so as to faithfully apply the principle to each situation which might thereafter arise.

This task begins with a specific focus upon the following language: "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . . ." CONST. art. I, § 11.

██ ██ The verb "appropriated" means "[t]o prescribe a particular use for particular moneys; to designate or destine a fund or property for a distinct use . . . ." BLACK's LAW DICTIONARY 101 (6th ed. 1990). Similarly, "applied" generally means "to use or employ for a particular purpose; to appropriate and devote to a particular use, object, demand, or subject matter." *Id.* at 99. In this text the terms require one to determine whether our government has purposefully transferred, or made available, money or property for the defined objective. Ultimate utilization of the money or property is a necessary but insufficient part of the constitutional test; a religious purpose is the key.

Without proceeding further it is at once apparent that the appropriation of money, or application of property, to

---

[31]"Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 451 (Melville M. Bigelow ed., 5th ed. 1891).

effectuate any objective other than religious worship, exercise, instruction, or religious establishment is not within the prohibition.

Were the chaplains paid for their time, and a portion of their time was necessarily devoted to religious worship, we would have a closer question; however, that is not our case. At most we are dealing with cars, insurance, radios, and the like, which are not only intrinsically secular in nature but also are purposely "appropriated" or "applied" to accomplish a secular counseling objective. That the unpaid volunteer might pause to join an injured victim in a consensual prayer does not alter the government's objective to appropriate property from a secular one to a sectarian one, although it may well reflect the volunteer's exercise of his personal religious conscience. But the latter is of no constitutional moment because the volunteer is not the property of the State and the exercise of his conscience is not Mr. Malyon's burden to bear.

The context in which the clause appears stands in testamentary witness to the correctness of this result. "[T]o read the language of the constitution without regard to the context in which it was written" would be inconsistent with principles of responsible jurisprudence. Conklin & Vaché, *supra* at 457. As previously noted, the entire article I, section 11 is entitled "Religious Freedom" and must, on fair reading, be said to serve that purpose. From the context it is plain the prohibition against appropriation or application of public money or property to a religious purpose is a means to an end, yet not an end in itself.

This contextual conclusion is reinforced by the modifying proviso which mandates "this article shall not be so *construed*" to prohibit the employment of a chaplain with public funds under numerous circumstances. This rule of construction literally pertains to the entire article—it is not, as the dissent would have it, merely an exclusive list

of exceptions.[32] But how could the article in its entirety be consistently construed to hire a prison chaplain at public expense while at the same time forbid an unpaid volunteer chaplain from saying a prayer?

That the program's volunteers may still practice or benefit religion in some sense proves no constitutional violation under our prior precedent either.

This we recognized in *Health Care Facilities Auth. v. Spellman*, 96 Wn.2d 68, 633 P.2d 866 (1981) when we held that religious hospitals can, consistent with article I, section 11, raise money through public tax exempt bonds. By making this method of financing available to a private religious institution the state conferred a tremendous financial benefit on a religious establishment but without violating the state constitution in the slightest. *Id.* at 72.[33]

Public education cases seem to be subject to stricter scrutiny but are often considered under the same constitutional article. *Perry v. School Dist. No. 81*, 54 Wn.2d 886, 344 P.2d 1036 (1959) involved a school release program where students were allowed to leave school one hour per week to pursue outside religious instruction. No state resources were utilized for the religious study per se at private off-campus sites; however, publicly salaried school teachers handed out registration cards to interested students on school property. The distribution of these cards was deemed an impermissible "*use* of school facilities supported by public funds for the promotion of a religious program" and the program was struck down. *Id.*

---

[32]Unlike the dissent, we view this as a rule of construction because the text says it is. It defies reason to treat what overtly purports to be a rule of construction as an invitation to engraft a new exception by constitutional amendment every time there is a new application of the general rule. Compare Dissent at 816, 819-20. The dissent cites no case to support its claim.

[33]*Compare Higher Educ. Assistance v. Graham*, 84 Wn.2d 813, 817, 529 P.2d 1051 (1974) in which we held a college loan program violative of art. I, § 11 because the program loaned money to students attending religious institutions. There the "public money" actually found its way to a religious establishment.

at 896.[34] *Perry* has been criticized as a "dogmatic hostility to church-related schools . . . ." Conklin & Vaché, *supra* at 423,[35] but even so it was an appropriation of public money to pay public school teachers' salaries and public property to promote a religious program. That is not the case here—these are unpaid volunteers who are charged by the government to accomplish a secular objective.

*Calvary Bible Presbyterian Church v. Board of Regents*, 72 Wn.2d 912, 919, 436 P.2d 189 (1967), *cert. denied*, 393 U.S. 960, 89 S. Ct. 389, 21 L. Ed. 2d 372 (1968) upheld the constitutionality of a University of Washington course teaching the Bible as literature, noting that the course was taught at the university in a secular setting where intellectual independence replaces the captive minds of younger students. Again, the court found the course was not "religious instruction"[36] although Bible study can certainly be an aspect of many organized faiths and may have promoted religion in that sense.

To further test the presence of prohibited state financial aid to religion, we also should consider the free exercise rights of the volunteers because free exercise is precisely the opposite of coerced establishment. These volunteers have chosen to become credentialed ministers. The sheriff's department neutrally sought any qualified volunteers without regard to religion. If ordinary lay

---

[34]*Perry* was based on the peculiar concerns of the state constitution as the United States Supreme Court had found a similar time-release program permissible in *Zorach v. Clausen*, 343 U.S. 306, 72 S. Ct. 679, 96 L. Ed. 954 (1952).

[35]Justice Utter observed that "Const. art. 1, § 11 [has been] applied primarily in the context of prohibiting certain kinds of devotional sectarian instruction in public primary and secondary schools." *Witters v. Commission for the Blind*, 102 Wn.2d 624, 649, 689 P.2d 53 (1984) (*Witters* I) (Utter, J., dissenting).

[36]*Also see Bill of Rights Legal Found. v. Evergreen State College*, 44 Wn. App. 690, 723 P.2d 483 (1986) which, while addressing the federal constitution, illustrates this court's use of less stringent analysis when faced with a religion case outside the education realm. There the court upheld the constitutionality of a lecture series on ethics and morality co-sponsored by the state college at a local church. Employing a less stringent review the court noted: "The setting here is vastly different from a sectarian school where the audience basically is a captive one, consisting of impressionable school-age children. Here, the program was open to the public [and] was unarguably secular in nature . . . ." *Id.* at 695-96.

citizens volunteered as sheriff's chaplains, and they occasionally prayed with their fellow citizens, that would be their choice, not the state's. They would have "appropriated" their time, but the state would not have "appropriated" them. If a trooper prayed in his patrol car or a legislator rose from his seat at the Capitol when the chaplain opened the assembly in prayer the same would be true. These volunteer citizens are no less religiously free simply because they are ministers and/or openly profess their faith. If they choose religion that is their right. This does not change because they also volunteer their services to assist the state to accomplish its objective.[37]

By undisputed fact the annual $3,000 "appropriated" for the program provides items of personal property such as uniforms and transportation which are, in themselves, wholly secular in nature and would be as necessary whether volunteers engaged in any religious activities or not. Moreover, any possible religious conduct by volunteers is not the purpose of any appropriation of money or application of property in any event. Nor are the taxpayers financially underwriting the activities of these volunteers. As there is no financial cause for taxpayer complaint, to coin Mr. Jefferson's phrase, Mr. Malyon has simply not been compelled to furnish contributions of money to propagate opinions with which he disagrees.

## II. Federal Analysis

The federal issue is whether the volunteer chaplaincy program represents an impermissible establishment of religion contrary to the First Amendment to the United States Constitution, which states in relevant part:

---

[37]One commentator notes the risk of overzealous application of the anti-establishment clause could lead to "the spectacle of the snake of anti-establishment doctrine eating its tail of free exercise of religion." Conklin & Vaché, *supra* at 417. Also compare *Witters* II, 112 Wn.2d at 372 (Utter, J., dissenting) (the decision to apply funds to a religious school is "made by the individual," not the state); and *Witters* II at 390 (Dolliver, J., dissenting) (by holding Larry Witters ineligible to receive public funds for education "merely because he made the personal choice to pursue a religious career, the court denies Witters his religious freedom . . . .").

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

The First Amendment to the United States Constitution was not enacted to remove religion from every aspect of our civic life. If it was, its task is far from complete. Christmas is a national holiday; our national motto is "In God We Trust." The United States Supreme Court opens each session with the invocation "God save the United States and this Honorable Court."

Such has not led to an established state religion. There is no country freer in its religious exercise.

After the establishment clause of the First Amendment was adopted, Jefferson and Madison made metaphorical reference to "a wall of separation" between church and state.[38] Meanwhile George Washington and John Adams acknowledged a common Protestant heritage and urged the creation and support of a civic Christian religion.[39] Still others counseled the First Amendment was simply meant to keep Congress from interfering with state-sponsored religious establishment.[40] Today's fear of a religious establishment need not "bring us into 'war with our national tradition as embodied in the First Amendment's guarantee of the free exercise of religion.' " *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (quoting *McCollum v. Board of Educ.*, 333 U.S. 203, 211-12, 68 S. Ct. 461, 92 L. Ed. 649, 2 A.L.R.2d 1338 (1948)). Religious freedom is the end. Avoidance of a state-sponsored church is a means.

The Supreme Court construes the First Amend-

---

[38]*See* Thomas Jefferson's Reply to Danbury Baptists letter dated January 1, 1802, THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON, *supra* at 332-33. Roger Williams originated the "Wall of Separation" metaphor in 1644 when he wrote of a "hedge or wall of separation between the garden of the church and the wilderness of the world."

[39]John Witte, Jr., *The Essential Rights and Liberties of Religion in the American Constitutional Experiment*, 71 NOTRE DAME L. REV. 371, 400 (1996).

[40]*See, e.g.*, Joseph M. Snee, *Religious Disestablishment and the Fourteenth Amendment*, 1954 WASH. U. L. Q. 371.

ment to "affirmatively mandate[ ] accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch*, 465 U.S. at 673. Justice Douglas similarly summarized the constitution "respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe." *Zorach v. Clauson*, 343 U.S. 306, 314, 72 S. Ct. 679, 96 L. Ed. 954 (1952). Professor Tribe agrees: "The first amendment does not require—indeed, it does not permit—government to be totally oblivious to religion. Government may sometimes accommodate religion; in some circumstances, it must do so. Thus the question in not *whether* government and religion will interact, but *how*." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 14-14 at 1276 (2d ed. 1988).

Instructive on the issue before us are two chaplaincy cases, both arising under the United States Constitution.

*Marsh v. Chambers*, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) considered whether use of a paid Christian minister as a legislative chaplain to lead the Nebraska legislature in prayer violated the federal establishment clause. While recognizing use of a salaried minister admittedly involves some church-state interaction, the Court upheld the constitutionality of the practice, reasoning that legislative chaplains are "part of the fabric of our society." *Id.* at 792.

*Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985) considered whether the military's use of paid chaplains violated the establishment clause of the First Amendment. The court noted the long history of military chaplains dating back to the Continental Army, then focused on the free exercise clause and held that to prohibit chaplains in the military would effectively deny military personnel their constitutional right to practice religion. *Id.* at 225. The court

concluded government employment of military chaplaincies does not run afoul of the establishment clause. *Id.* at 224. These cases illustrate the government may facilitate religion while not destroying the freedom of the individual to either practice or refrain.

Public schools are a focus of concern; however, the problem is cast in a different light in noneducation cases. *Edwards v. Aguillard*, 482 U.S. 578, 583-84, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.").

## A. The Lemon test

■ In 1971 the United States Supreme Court synthesized prior case law into a three-prong test used to determine whether a challenged state activity amounts to an impermissible establishment of religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971). To survive constitutional attack the act: (1) must have a secular purpose; (2) may not have as its primary effect the advancement of religion; and (3) must not create an excessive entanglement between church and state. *Id.* at 612-13.

### 1. Applicability of Lemon

A majority of the Court of Appeals in the opinion below declined to apply *Lemon*.[41] This was error. Concurring by special opinion, Chief Judge Seinfeld correctly stressed "the United States Supreme Court, to date, has not overruled or limited the application of *Lemon* to the public school context [and] I believe that it is premature for us to do so."[42] We agree.

---

[41]*Malyon*, 79 Wn. App. at 485 ("[W]e conclude that the United States Supreme Court would not apply the *Lemon* test to a police chaplaincy.").

[42]*Id.* at 491 (Seinfeld, C.J., concurring).

The Supreme Court has indeed declined to apply the *Lemon* test in recent cases;[43] however, it has not overruled *Lemon. Lemon's* applicability is not limited to school cases as the Court of Appeals suggests.[44] We hold that until the Supreme Court abandons the *Lemon* test, it shall apply to establishment clause issues under the First Amendment. The dissent agrees.[45] Our continued adherence to the *Lemon* test conforms to every circuit court and every state supreme court case directly involving the establishment clause during the last two years.[46]

### a. Secular purpose

 *Lemon's* first prong inquires into the "secular purpose" of the challenged act. *Lemon*, 403 U.S. at 612-13. Rather than require the purpose be entirely secular, this prong demands there be at least some valid secular purpose to ensure that "religious concerns were not the

---

[43]*See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995); *also see Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995).

[44]*See Bowen v. Kendrick*, 487 U.S. 589, 621, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988) (using *Lemon* test to analyze federal grants to teen counselors); *see also Lynch v. Donnelly*, 465 U.S. 668, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (applying *Lemon* to town's display of Christmas nativity).

[45]Dissent at 819. The dissent also concedes the first two *Lemon* prongs are met but claims that the third is not. Dissent at 819 ("the chaplaincy program admittedly has a primary secular purpose, and while the primary effect of the program is not to advance religion . . . .").

[46]*A.C.L.U. of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1484 (3d Cir. 1996) ("*Lemon* remains the law of the land, and we are obligated to consider it until instructed otherwise by a majority of the Supreme Court."); *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1343 (4th Cir. 1995) ("Nevertheless, until the Supreme Court overrules *Lemon* and provides an alternative analytical framework, this Court must rely on *Lemon* . . . ."); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 405 (5th Cir. 1995) ("We will adhere to [*Lemon*] today."); *Hartman v. Stone*, 68 F.3d 973, 979 (6th Cir. 1995) ("We review Establishment Clause claims under *Lemon v. Kurtzman* [ ]."); *Droz v. Commissioner IRS*, 48 F.3d 1120, 1124 (9th Cir. 1995) ("Thus, the *Lemon* test applies."); *Robinson v. City of Edmond*, 68 F.3d 1226, 1229 (10th Cir. 1995) ("[T]he Supreme Court has specifically declined to overrule [*Lemon*]."), *cert. denied*, 517 U.S. 1201, 116 S. Ct. 1702, 134 L. Ed. 2d 801 (1996); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir 1996); *Van Osdol v. Vogt*, 908 P.2d 1122, 1131 (Colo. 1996) ("[T]he *Lemon* test continues to apply.").

sole motivation behind the [a]ct." *Bowen v. Kendrick*, 487 U.S. 589, 602-03, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988). In *Edwards v. Aguillard*, 482 U.S. 578, 599 (1987) Justice Powell, concurring, explained "[a] religious purpose alone is not enough to invalidate [a state act]. The religious purpose must predominate." *See Lynch*, 465 U.S. at 680-81 (town's display of a Christmas crèche is constitutional because it has a legitimate secular purpose in depicting the origins of the national holiday of Christmas); *Carter v. Broadlawns Med. Ctr.*, 857 F.2d 448 (1988) (county hospital's hiring of a paid Christian minister as chaplain held constitutional because it had the secular purpose of enhancing a holistic approach to patient care), *cert. denied*, 489 U.S. 1096, 109 S. Ct. 1569, 103 L. Ed. 2d 935 (1989); *cf. Stone v. Graham*, 449 U.S. 39, 41, 101 S. Ct. 192, 66 L. Ed. 2d 199 (1980) (statute requiring posting of the Ten Commandments in all schoolrooms is unconstitutional because it lacks *any* discernible secular purpose).

The sheriff's department's chaplaincy program similarly has the valid secular purpose to provide secular counseling. The program therefore passes muster under the first prong of *Lemon*.

### b. Primary effect

██ *Lemon*'s second prong asks whether the *primary* effect of the act is to advance religion. *Lemon*, 403 U.S. at 612-13. In *Bowen v. Kendrick*, the Supreme Court considered whether aid, neutrally awarded to conduct teen pregnancy counseling, violated the establishment clause when awarded to a particular religious group. 487 U.S. at 612. The Court held that it would have a primary effect of advancing religion under the second *Lemon* prong if the grant "inculcate[d] the views of a particular religious faith." *Id.* at 621.

When determining the primary effect of a given government act, the religious affiliation of the actors is not

determinative. On the contrary, the Court has held the fact that one of the actors is religiously affiliated or inspired is not enough to show that the act advances religion. *See Bradfield v. Roberts*, 175 U.S. 291, 20 S. Ct. 121, 44 L. Ed. 168 (1899) (state may give money to Catholic sisterhood to run a hospital so long as the hospital is primarily secular and open to all); *Carter*, 857 F.2d 455 (use of a Christian pastor as a paid chaplain-counselor did not have the primary effect of advancing religion because the chaplain "avoided proselytization"[47] and was primarily a counselor with the versatility and training needed to help people of all religious backgrounds as well as those with no religious background at all).

*Voswinkel v. City of Charlotte*, 495 F. Supp. 588, 595-97 (1980) held Charlotte police department's use of a Baptist minister as chaplain failed the second prong of the *Lemon* test because: the department contracted directly with the Providence Baptist Church, giving it a superior opportunity to disseminate its doctrine; the department paid half of the chaplain's $20,000 salary; and the position, by its terms, had to be filled by a minister, creating a per se unconstitutional religious test for public employment.

However the "primary effect" of the police chaplaincy program is not advancement of religion under the second prong of the *Lemon* test, even if that counseling addressed religious issues in specific situations.[48] Barring counselors from entering the spiritual or religious realm would be hostile to those counseled who hold religious or spiritual beliefs. Additionally, barring ministers from volunteering in this secular setting simply because they are ministers

---

[47]"Proselyte" means "to convert from one religion . . . to another." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1821 (1981). There is none of that in this record, contrary to the dissent's implication (Dissent at 817, 821).

[48]*See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, p. U:8 (4th ed. 1993) (counseling should include attention devoted to religious and ideologic beliefs "in a context of emphatic respect for their value and meaning to the patient.").

would raise serious free exercise issues under the First Amendment.[49]

The sheriff's chaplaincy program does not have the suspect characteristics which led to the invalidation of the chaplaincy in *Voswinkel*. Indeed, *Voswinkel* itself indicates its inapplicability here: "the creation of a counseling position to which any counselor could apply and be considered on a religiously neutral grounds is not a government action that could reasonably be said to threaten 'an establishment of religion.'" 495 F. Supp. at 600. The chaplains here, unlike *Voswinkel*, were neutrally chosen through a bidding process open to all without regard to religious affiliation and the chaplains actually volunteering come from all denominations. The distinction is clear in *Voswinkel* that the court did "not believe that a public employee, hired as a counselor through some neutral selection process, is constitutionally required to refrain from discussing 'spiritual' or 'moral' matters in the course of his counseling duties." *Id.* at 600.

Our case is most analogous to the hospital chaplaincy in *Carter* because the police chaplains here do not proselytize but do provide broad-based counseling to people of all religions, and those with no religion at all, in a secular manner. *Carter*, 857 F.2d 448. The similarity continues in that the religious expertise of the chaplains is available to all as is their crisis intervention counseling. The Supreme Court has noted "provision of benefits to [a] broad [ ] spectrum of groups is an important index of secular effect." *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981). Like the Catholic nuns in *Bradfield*, 175 U.S. 291, the volunteers may be religiously inspired but

---

[49]*Voswinkel*, 495 F. Supp. at 599-600 ("to reject a job applicant because he is an ordained minister would violate the First Amendment prohibition against government interference with 'the free exercise of religion'. . . ."); *see also McDaniel v. Paty*, 435 U.S. 618, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (Tennessee statute barring religious ministers from serving in the constitutional convention violates free exercise); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (government cannot, consistent with free exercise principles, selectively discriminate against conduct "motivated by religious belief").

run the operation free of proselytizing and open to all. The primary effect of this program is not to advance religion. Thus it passes the second prong of *Lemon*.

### c. Entanglement

██ *Lemon*'s third prong asks whether the challenged governmental action gives rise to an "excessive entanglement" between church and state. *Lemon*, 403 U.S. at 612-13. Some "entanglement" is permissible so long as it does not become "excessive."

Excessive entanglement occurs when the distinction between the state and the church functions becomes blurred and such functions noticeably overlap. In *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127, 103 S. Ct. 505, 74 L. Ed. 2d 297 (1982), for example, the Supreme Court struck down a Massachusetts law authorizing churches to veto the state's issuance of liquor licenses because it "enmesh[ed] churches in the process of government." The Court noted that one of the driving forces behind the establishment clause was the concern of "political oppression through a union of civil and ecclesiastical control." *Id.* at 127 n.10.

In *Voswinkel*, the police chaplaincy case, the court found excessive entanglement resulting from the uncertainty over whether the chaplain was a church or state official, or both. The Baptist minister was paid by both church and state and answered to both. *Voswinkel*, 495 F. Supp. at 597. The services of the minister were provided by the Baptist Church yet the minister was "staff assistant to the Chief of Police." *Id.* at 598.

In *Carter*, the hospital chaplaincy case, the court upheld the program despite a finding that the presence of a minister in the hospital admittedly "causes some entanglement." *Carter*, 857 F.2d at 456. The present case is most analogous to *Carter* in that the entanglement is not excessive. This case is distinguished from *Voswinkel* because the present program lacks *Voswinkel's* excessively entangling characteristics; notably, the chaplains are clearly

under the authority of the sheriff's department alone, do not serve as representatives of their personal denominations, and are not paid a state salary. *Voswinkel*, 495 F. Supp. at 595-97. Here there is no impermissible union of ecclesiastical and state control nor is any church enmeshed in the processes of government. The sheriff's chaplaincy passes the third *Lemon* prong.

The dissent claims the entanglement prong incorporates an "endorsement of religion" test. Dissent at 819. It asserts such endorsement test is a "refinement" of *"Lemon's* entanglement analysis," Dissent at 820, and relies upon *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh*, 492 U.S. 573, 600, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989). Dissent at 820-21.

However, *County of Allegheny* explicitly uses the endorsement test to analyze the first two *Lemon* prongs, prongs which the dissent already concedes are met. *Allegheny*, 492 U.S. at 592 ("we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing religion' . . . .").[50]

Were the dissent to apply *Lemon* correctly, the third inquiry would instead be whether the program fosters " 'an excessive entanglement with religion,' " *Lemon*, 403 U.S. 613 (citations omitted), and it must conclude, as have we, the chaplaincy program does not foster excessive entanglement.[51]

▮▮▮▮ Thus, we conclude that the use of volunteer

---

[50]*Lynch* also clearly reflects the endorsement inquiry goes to the first two prongs, not the third. *Lynch*, 465 U.S. at 688-91 ("The central issue in this case is whether Pawtucket has endorsed Christianity by its display of the crèche. . . . The purpose and effect prongs of the *Lemon* test represent [this inquiry].")

[51]*See, e.g., Lynch*, which concluded a town display of a crèche does not foster excessive entanglement and does not establish religion. *Lynch*, 465 U.S. at 688.

"[T]he Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused 'to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history.' "

*Id.* at 678 (citation omitted).

chaplains by the Pierce County Sheriff's Department complies with the First Amendment of the United States Constitution. This chaplaincy program (1) has a valid secular purpose; (2) does not primarily effect the advancement of religion; and (3) does not result in excessive entanglement.

### III. Fundraising

Malyon seeks an injunction against any use of County facilities for fundraising for TPCC. Malyon alleges that the sheriff's department assisted TPCC in fundraising on two occasions some six years ago, and Malyon asserts such assistance violates the establishment clause and he seeks a permanent injunction against any such future activities. The trial court dismissed this portion of Malyon's complaint because Malyon had not shown that the sheriff's department continues to engage in the challenged practices. The Court of Appeals remanded for a factual determination as to whether the sheriff's department continues to assist TPCC in its fundraising and, if so, whether the practice violates the Washington Constitution. *Malyon*, 79 Wn. App. at 480-81. Such remand is unnecessary and we dismiss the claim.

One who seeks relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of either are resulting in or will result in actual and substantial injury to him. *Tyler Pipe Indus., Inc. v. Department of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982).

There is no evidence in the record that the County continues to support any fundraising. Some fundraising did occur, most recently six years ago, in 1990. This evidence, in a light most favorable to Malyon, cannot support a finding that there is any well grounded fear of immediate recurrence. Accordingly, summary judgment in the County's favor is appropriate on this issue and is hereby ordered.

*Conclusion*

We hold the Pierce County Sheriff's Department's chaplaincy program satisfies both Washington Constitution article I, section 11 and the United States Constitution First Amendment. In particular we conclude: (1) an independent reading of article I, section 11 is appropriate; (2) consistent with article I, section 11, the volunteer chaplaincy program does not appropriate public money or property for religious worship, exercise, instruction, or the support of any religious establishment; and (3) the chaplaincy does not violate the establishment clause of the First Amendment. We deny Malyon's demand for an injunction against fundraising activities which have already ceased. The Court of Appeals' remand is reversed, the trial court's summary judgment of dismissal is affirmed, and the County shall recover its costs.

DURHAM, C.J., and GUY, JOHNSON, and ALEXANDER, JJ., concur.

DOLLIVER, J. (dissenting) — I dissent. Before the majority can grant summary judgment to Defendant, it is required to view the facts most favorable to the nonmoving party. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). In calling for summary judgment for Defendant, however, the majority blatantly ignores the Plaintiff's substantiated allegations — allegations which Defendant has never refuted. The record plainly shows these police chaplains engage in some amount of religious worship, exercise and proselytizing. It is also clear that public funds and property are used to support the facially secular chaplaincy program through which this religious worship occurs. I find the religious aspects of the chaplaincy program, as conducted, violate article I, section 11 (amend. 88). Furthermore, insofar as these police chaplains operate under the guise of state sponsorship, I find that any amount of religious conduct by these state-endorsed chaplains violates the Establishment Clause. I would grant summary judgment for Plaintiff.

First and foremost, the public value of this chaplaincy program cannot be understated. I do question the use of the title "chaplaincy program," noting Pierce County defends its program as a *secular* counseling program. I have no doubt that these honorable volunteers benefit the state by meeting the counseling needs of its police officials at times of crisis. I am also certain that members of the public are well served by the volunteer counselors.

Despite the importance and value of this program, this court's reading of the constitution cannot be swayed by public sentiment. *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 562, 452 P.2d 943 (1969). Furthermore, this court "cannot engraft exceptions on the constitution, 'no matter how desirable or expedient such . . . exception might seem.' " *State ex rel. Anderson v. Chapman*, 86 Wn.2d 189, 196, 543 P.2d 229 (1975) (quoting *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 806, 399 P.2d 623 (1965)). When reading the constitution, words are given their plain and ordinary meaning unless it can be shown that a different meaning was intended. *Zachman v. Whirlpool Fin. Corp.*, 123 Wn.2d 667, 670, 869 P.2d 1078 (1994). When the language is plain and unambiguous on its face, a court *cannot* resort to construction or interpretation to avoid the impact of the plain language. *Anderson*, 86 Wn.2d at 191. The majority plainly ignores these rules when it uses a slanted, result-oriented analysis to justify its holding.

I agree with the Court of Appeals and the majority that the analysis in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) provides ample basis for interpreting article I, section 11 (amend. 88), independently of its federal counterpart. I disagree in how the majority applies the language of section 11 to the facts of this case.

Public money and property cannot be "appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment[.]" CONST. art. I, § 11 (amend. 88). The section contains an

exception, which was added by amendment 4 in 1904, and was expanded two more times by amendments 34 and 88, passed respectively in 1958 and 1993. The exception currently states:

> [T]his article shall not be so construed as to forbid the employment by the state of a chaplain for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice . . . .

CONST. art. I, § 11 (amend. 88). None of the limited categories in this exception addresses a county sheriff's supporting a police chaplaincy program; therefore, the exception cannot be used to support the majority's holding.

To determine if article I, section 11, prohibits a particular activity, we first ask whether public money or property is involved, and if so, we then determine if the assets are used to support any religious activity. *Washington Health Care Facilities Auth. v. Spellman*, 96 Wn.2d 68, 71, 633 P.2d 866 (1981). All parties concede that public funds and public property are used to support the chaplaincy program. All parties concede that chaplains engage in some amount of religious exercise. *See Malyon v. Pierce County*, 79 Wn. App. 452, 476-77, 903 P.2d 475 (1995) ("[V]olunteer chaplains engage in religious worship, exercise or instruction. The record discloses that they pray, read scripture, and occasionally 'share' about Jesus or 'share' the Gospel."). This chaplaincy program is partially supported by public money and property, and it is being used as a vehicle through which official police chaplains engage in religious activity. These two simple facts, by themselves, require a finding that the chaplaincy program, as it is conducted, violates article I, section 11 (amend. 88), of our constitution. My holding does not reflect an attempt to purge religion from society; rather, I am merely attempting to abide by the constitutional requirement that public money and property not be used to support religious worship, exercise, or instruction.

I find nothing wrong with a religious organization like

the Tacoma-Pierce County Chaplaincy (TPCC) program contracting to provide services for the government. The constitutional violation occurs when a religious organization uses a state-supported program to engage in religious activity. Unlike the Court of Appeals and the majority, I cannot turn a blind eye to the conduct of these supposedly secular chaplains. All people have the fundamental right to exercise freely their religious beliefs, but they cannot misuse state-sponsored programs as platforms to espouse their beliefs and minister to the public.

The Court of Appeals and the majority attempt to distract the reader from the chaplains' admitted religious activity by focusing, instead, on the fact that the contract for the chaplaincy program is facially secular. Never before has this court sanctioned such a superficial analysis when considering a fundamental constitutional issue.

In *Witters v. Commission for the Blind*, 112 Wn.2d 363, 771 P.2d 1119 (*Witters II*), *cert. denied*, 493 U.S. 850 (1989), we prohibited the use of state funds to pay for a blind student's financial aid at a religious school. In applying article I, section 11, we never looked at the legislation establishing the financial aid program — had we done so, we would have found the program *was facially secular*. The United States Supreme Court had previously pointed out the financial aid program in itself was "in no way skewed towards religion." *Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481, 488, 106 S. Ct. 748, 88 L. Ed. 2d 846 (1986). The court further observed:

> No evidence has been presented indicating that any other person has ever sought to finance religious education or activity pursuant to the State's program . . . .

*Witters*, 474 U.S. at 488. Despite the facially secular nature of the financial aid program, and despite the fact that Witters was apparently the *only student* out of many to use the public assistance for a religious education, this court held the use of state funds still violated the " 'sweeping and comprehensive' " language of the state constitu-

tion. *Witters* II, 112 Wn.2d at 370 (quoting *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 173 P. 35 (1918)).

Despite the fact that the bid proposal and the resulting contract for the chaplaincy program are facially secular, and despite the allegation that less than 15 percent of the chaplains' contacts involve religious activity, I find the use of any public assets for this program violates article I, section 11 (amend. 88) because of the program's religious content.

It does not matter that the chaplaincy program does not directly contribute public money or property to a religious organization. In *Mitchell v. Consolidated Sch. Dist. 201*, 17 Wn.2d 61, 135 P.2d 79, 146 A.L.R. 612 (1943), this court invalidated legislation permitting parochial school students to ride on public school busses, even when the busses did not have to go out of their normal route to provide transportation for the parochial students. The private schools received no moneys, and did not directly use any public properties, yet the legislation still violated article I, section 11. *See also Visser v. Nooksack Valley Sch. Dist. 506*, 33 Wn.2d 699, 207 P.2d 198 (1949) (relying on *Mitchell* in denying a writ of mandamus seeking to compel public school busses to transport private school students). Similarly, section 11 is violated when public funds and property are used to support this chaplaincy program — a program through which the chaplains engage in religious worship and instruction.

The chaplaincy program has two options to avoid the constitutional hurdle imposed by article I, section 11 (amend. 88). It can either disassociate itself from any governmental support and continue the religious conduct, or it can establish written rules to assure the chaplains attend only to the secular needs of the program and refer persons in spiritual need to private ministers who are not working under the guise of a state-endorsed chaplaincy program. Despite the Court of Appeals' characterization of such result as honoring form over substance, *Malyon*, 79 Wn. App. at 480, this result is mandated by our state con-

stitution. Even if the chaplains are unpaid, their being representatives of an official, state-endorsed and state-supported program brings their conduct under the restrictions of article I, section 11 (amend. 88).

A third option for the supporters of this chaplaincy program is to seek an additional amendment to section 11. In 1993, health care interest groups were successful in obtaining legislative and public approval of amendment 88, which allows the employment of chaplains in hospitals and hospices. If public financial support of police chaplains is necessary, and if the religious conduct of these chaplains is also necessary, then the program's supporters should propose another amendment to the Legislature and the people of this state. The majority would apparently take it upon its own initiative to amend our state constitution for us. .

### The Establishment Clause

While I agree with the majority that we should follow *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), until it is overruled, I disagree with the manner in which the majority has applied it. While the chaplaincy program admittedly has a primary secular purpose, and while the primary effect of the program is not to advance religion, I find that any religious worship, instruction, or exercise conducted by these police chaplains creates an impermissible entanglement between church and state and creates an impression of state endorsement of religion. *See Lemon*, 403 U.S. at 612-13.

Although the County's contract with TPCC explicitly regards the volunteer chaplains as independent contractors, Resp't Clerk's Papers at 82-83, the chaplains are answerable to, and work under the direction of, the county sheriff. Appellant Clerk's Papers at 258. The County pays for their accident insurance, medical insurance and liability insurance for liability incurred in volunteer service. The County's brief refers to the chaplains as "Sheriff's Chaplains." *See* Br. of Resp't at 3. This official title conveys the impression that these chaplains are serv-

ing, albeit without pay, as official representatives of the sheriff's department. The head of the chaplaincy program maintains an office in the sheriff's department. Some chaplains wear police jackets. In the promotional video produced by TPCC, some scenes show a chaplain wearing a dark jacket with what appears to be an official insignia over the left breast pocket. Within that insignia is a cross.

The interwoven relationship between the chaplaincy program and the sheriff's department creates a fundamental problem every time a chaplain engages in religious worship or instruction with an individual: the conduct is implicitly marked with the stamp of government approval and entangles the state with the religious conduct of the chaplains. The United States Supreme Court has found the appearance of government endorsement of religion to violate the Establishment Clause. *See, e.g., County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh*, 492 U.S. 573, 600, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989) (county's displaying a crèche in a prominent location in the county headquarters "sends an unmistakable message that it supports and promotes" a Christian message); *see also Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617 (9th Cir. 1996) (51-foot-tall Latin cross standing in a city park represented an impermissible governmental endorsement of Christianity in violation of Establishment Clause). The Supreme Court has described its "endorsement" analysis as a further refinement of the 3-part *Lemon* test:

> In *Lemon v. Kurtzman*, . . . the Court sought to refine these principles by focusing on three "tests" for determining whether a government practice violates the Establishment Clause. Under the *Lemon* analysis, a statute or practice which touches upon religion . . . must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion. 403 U.S., at 612-613. This trilogy of tests has been applied regularly in the Court's later Establishment Clause cases.
>
> Our subsequent decisions further have refined the defini-

tion of governmental action that unconstitutionally advances religion. In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion, a concern that has long had a place in our Establishment Clause jurisprudence.

*County of Allegheny*, 492 U.S. at 592 (footnote omitted).

An official police chaplain, who is wearing a police jacket and who is sitting down and praying or reading scripture with members of the public, does nothing other than to convey the message that the government endorses the religious message being espoused by the chaplain. Having an official county chaplain engage in any religious worship excessively entangles the government with religion and is impermissible under the Establishment Clause.

I would hold unconstitutional any religious activity by these police chaplains based on *Lemon* and *County of Allegheny*. The chaplaincy program through which this religious activity occurs is sponsored and supported by the sheriff's department, which is an arm of the state. Because of the chaplaincy program's relationship with the sheriff's department, the chaplains must absolutely refrain from *any* religious activity to avoid excessive entanglement or the appearance of state endorsement.

Not only does any religious activity by a police chaplain create an impression of state endorsement of religion, there is even an aspect of implicit coercion. The police are the ones who call the chaplain to a scene of "crisis." The chaplain may or may not be wearing a police jacket and bullet-proof vest, as well as carrying a police radio. To a person in crisis, having the police call to the scene an "official" chaplain to help counsel the person could potentially create an atmosphere of implicit coercion — a situation which clearly violates the Establishment Clause.

In conclusion, despite the County's unsupported assertion that chaplains are told not to proselytize, it is clear from the record that explicitly religious conduct occurs in a number of the chaplains' contacts with individuals.

Because of this religious content, I find the chaplaincy program violates article I, section 11 (amend. 88), and the Establishment Clause, and I would grant summary judgment to the Plaintiff. If the sheriff plans on continuing to work with crisis counselors, whether they be ministers or lay people, salaried or volunteer, safeguards must be set up to prevent the counselors from engaging in any religious worship or exercise in their capacity as state-sponsored counselors.

SMITH and MADSEN, JJ., concur with DOLLIVER, J.